821 A.2d 851 (2003)
In the Matter of a Member of the Bar of the Supreme Court of Delaware: James F. BAILEY, Jr., Respondent.
No. 334, 2002.
Supreme Court of Delaware.
Submitted: January 22, 2003.
Decided: May 2, 2003.
Charles J. Slanina, Esquire, Tybout Redfearn & Pell, Wilmington, Delaware, for Respondent.
Mary Susan Much, Esquire, Wilmington, Delaware, for Office of Disciplinary Counsel.
Edward M. McNally, Esquire (argued), Morris, James, Hitchens & Williams LLP, Wilmington, Delaware, and Joseph A. Rosenthal, Esquire, Rosenthal, Monhait, Gross & Goddess, P.A., Wilmington, Delaware, for the amicus curiae Lawyers' Fund for Client Protection.
Before VEASEY, Chief Justice, HOLLAND, BERGER, and STEELE, Justices, and WALSH, Justice (Retired),[1] constituting the Court en Banc.
*853 PER CURIAM.
This is a lawyer disciplinary proceeding. The primary issue in this case is whether there is clear and convincing evidence to support the factual findings of the Board on Professional Responsibility that James Bailey, as the managing partner of his law firm, had engaged in "intentional and knowing, or at least reckless" misconduct with respect to the mishandling of his law firm's books and records. Based on its factual findings, the Board rejected the parties' stipulation and joint recommendation that Bailey be given a public reprimand for his misconduct and placed on probation for three years. Instead, the Board recommended, among other things, that Bailey be suspended for a period of six months and one day.
As a question of first impression in Delaware, we explicitly hold that the managing partner of a law firm has enhanced duties, vis-à-vis other lawyers and employees of the firm, to ensure the law firm's compliance with its recordkeeping and tax obligations under the Delaware Lawyers' Rules of Professional Conduct. A managing partner must discharge those responsibilities faithfully and with the utmost diligence. We conclude that there is clear and convincing evidence to support the Board's factual finding in this case that Bailey knowingly failed to discharge his responsibilities as managing partner; therefore, we approve the Board's recommended sanction.

Facts
Bailey was admitted to the Delaware Bar in 1975. He is, and was at all relevant times, the managing partner of the law firm Bailey & Wetzel ("the Firm"). As managing partner, Bailey is responsible *854 for maintenance of the Firm's books and records and is responsible for the filing and payment of all employee payroll taxes and corporate taxes associated with the operation of the Firm. He also is responsible for supervising any employee to whom any of his duties as managing partner might be delegated.
Martin Zukoff, CPA, an auditor for the Lawyers' Fund for Client Protection, conducted three investigatory and compliance audits of the Firm's financial books and records and provided the Office of Disciplinary Counsel ("ODC") with three audit reports dated, respectively, November 29, 2000, January 22, 2001, and May 3, 2001. The investigative audits were directed specifically at the Firm's books and records and tax filing and payment obligations. The compliance audits were to determine whether the Firm was in compliance with Rule 1.15 of the Delaware Lawyers' Rules of Professional Conduct ("DLRPC") and whether Bailey's Certificates of Compliance, filed as part of this Court's annual lawyer registration process, were complete and accurate. Another auditor, Joseph McCullough, conducted an extensive review and follow-up investigation of the Firm's bookkeeping and tax filing and payment obligations and submitted a fourth audit report to the ODC dated October 29, 2001.
The audits revealed numerous deficiencies in the Firm's bookkeeping obligations. The most significant deficiencies, which Bailey conceded, included the following:
 The Firm had not performed escrow account reconciliations or reconciliations of cash balances to total client funds held for the one-year period from December 1999 through November 2000.
 The Firm had discrepancies in its escrow account reconciliations for the period January 1999 through June 1999. Specifically, six checks, totaling $27,800, had been written from the Firm's escrow account and deposited into the Firm's operating account to cover shortages or anticipated shortages in the operating account. No specific client escrow funds were charged with these withdrawals. To reconcile the account balances, nonexistent "deposits in transit," totaling $27,800, were reflected in the escrow account ledgers.
 An inactive escrow account had overdraft balances from January 2000 through October 2000.
 An escrow account contained Firm funds in excess of the allowable $500.
 The Firm had not performed operating account reconciliations from December 1999 through March 2000 when the Firm's bank closed the operating account due to excessive overdraft charges.
 The Firm's operating account had overdraft balances every month from September 1998 through March 2000, with the highest negative balance reflected as $12,104 in July 1999.
 The Firm had not performed reconciliations on its new operating account from February 2000, when it was opened, through September 2000.
 The Firm's new operating account had overdraft balances from September 2000 through January 2001.
With respect to the Firm's tax reporting and payment obligations, the audit reports revealed the following:
 The Firm did not timely file and pay federal employment payroll taxes[2] for *855 the first and second quarters of 2000. These obligations were untimely paid on November 2, 2000. No money had been deposited into a Tax Deposit Account in anticipation of the payment of these taxes.
 The Firm did not timely file and pay federal employment payroll taxes for the fourth quarter of 2000. The total obligation was over $60,200. As of the time of the parties' stipulation, the Firm still owed about $13,000.
 The Firm did not timely file and pay federal employment payroll taxes for the first quarter of 2001. At the time of the parties' stipulation, the Firm still owed about $65,000. No deposits had been made into a Tax Deposit Account for this quarter.
 The Firm did timely file, but did not timely pay, its federal employment payroll taxes for the second quarter of 2001. Although about $10,000 had been deposited into a Tax Deposit Account, the total obligation was in excess of $51,000. As of the time of the parties' stipulation, the Firm still owed over $41,000.
 The Firm did not timely pay its quarterly federal unemployment taxes for 2000. Taxes for all four quarters of 2000 were paid in February 2001.
 The Firm did not timely pay its monthly state employee withholding taxes for 1999. The outstanding balance was untimely paid on January 16, 2001.
 The Firm did not timely file and pay its state employee withholding taxes for 2000 or the first two quarters of 2001. All taxes were untimely paid.
 The Firm did not timely file and pay its state unemployment taxes for all quarters of 2000. All state unemployment taxes were untimely paid on February 2, 2001.
 The Firm did not timely file and pay its city employee withholding taxes for all quarters of 2000. These taxes were untimely paid in 2001.
 The Firm's corporate taxes for 1996, 1997, and 1998 were untimely filed and paid. Corporate taxes for 2000 were timely filed but not timely paid.
 The Firm did not timely file and pay its Delaware gross receipts taxes for the second and third quarters of 2000.
In addition to the Firm's tax delinquencies, Bailey personally was delinquent in paying some portion of his federal income taxes for 1998, 1999 and 2000, although the tax returns were timely filed. Moreover, Bailey falsely certified to this Court on his Annual Lawyer Registration Statements for 1998, 1999, 2000, and 2001 that he was in compliance with his tax and/or record-keeping obligations.

Board Proceedings
By the time the ODC filed its petition for discipline in September 2001, Bailey and the Firm had taken remedial measures to correct many of the deficiencies identified in the audit reports.[3] Before the Board's hearing, the ODC and Bailey entered into a prehearing stipulation, which contained Bailey's admission to nine of the ten counts contained in the ODC's petition *856 for discipline. The stipulation also included the parties' joint recommendation of sanction of a public reprimand and a three-year period of probation with conditions.
In the stipulation, Bailey admitted that his misconduct resulted in the following nine violations of the Delaware Lawyers' Rules of Professional Conduct: (i) one count of misconduct in violation of Rule 1.15(a) (commingling funds);[4] (ii) one count of misconduct in violation of Rule 1.15(b) (failing to promptly deliver property belonging to another);[5] (iii) one count of misconduct in violation of Rule 1.15(d) (books and records violations);[6] (iv) one count of misconduct in violation of Rule 5.3 (failing to supervise nonlawyer assistants);[7] (v) two counts of misconduct in violation of Rule 8.4(c) (engaging in conduct involving dishonesty);[8] and (vi) three counts of misconduct in violation of Rule 8.4(d) (engaging in conduct prejudicial to the administration of justice).[9]
The Board held a hearing on December 18, 2001 at which the ODC and Bailey presented testimony in support of their stipulation and joint recommendation of sanction. The first witness to testify was *857 Joseph McCullough, the ODC's investigative auditor. McCullough testified that the ODC requested him to investigate several particular transactions that had been uncovered during the course of Martin Zukoff's compliance audits. The transactions in question involved six checks in varying amounts, totaling $27,800, which were written between January and June of 1999. The checks had been drawn on the Firm's client escrow account but were not deducted from specific client balances. The checks were deposited into the Firm's operating account. In order to make the escrow account balance, the bookkeeper had entered non-existent "deposits in transit." McCullough testified that the offsetting deposits into the escrow account for $27,800 were never actually made until after Zukoff's first audit in November 2000.
McCullough testified that, during the course of his investigation, he spoke to Sam Cook, the Firm's former bookkeeper who had written the checks. He also interviewed the Firm's current bookkeeper, Jan Moreland, and the Firm's outside accountant, Charles Seitz, CPA. McCullough testified that nothing in his investigation revealed any expenditures of an unusual nature during the relevant six-month time period that would have accounted for the need for the operating account to be supplemented by $27,800 in escrow funds. McCullough concluded that the transfers had been made in order to pay current repetitive bills that had become due. Both McCullough and Seitz testified that the Firm's books and records presently are being maintained in compliance with Rule 1.15.
Bailey also testified in support of the stipulation. He stated he had been admitted to the Bar in 1975 and began his own law firm in 1983. He brought Benjamin Wetzel into the Firm in 1990 as a partner. Since that time, the Firm has had two partners, several associates, and about a dozen employees. Bailey testified that he always has acted as the managing partner of the Firm, accepting supervisory responsibility, among other things, for the Firm's recordkeeping and tax obligations.
Bailey stated that, prior to Zukoff's first audit, he had been unaware that the Firm's books and records were not in compliance with Rule 1.15. Bailey specifically denied prior knowledge relating to the six checks, totaling $27,800, which had been written from the Firm's escrow account and deposited into the Firm's operating account during the period January through June 1999. Bailey testified that the Firm's bookkeeper at the time, Sam Cook, had made these transfers independently without Bailey's consent or knowledge.[10] Bailey expressed remorse for not fulfilling his responsibilities to supervise adequately the Firm's bookkeeping functions.
At the close of testimony, the Board concluded that it needed to hear Sam Cook's testimony and review additional documentation before deciding whether to accept the parties' stipulation and recommendation. Accordingly, the Board continued the hearing until January 2002 so that Cook's testimony[11] and the requested documentation, including complete copies of certain tax returns and Bailey's Annual Registration Statements, could be secured.
*858 The second hearing was held on January 28, 2002. Two witnesses appeared. The first witness was Sam Cook. Cook testified that he worked at the Firm as a bookkeeper from May 1994 to July 1999. Cook was questioned about the six checks he wrote on the Firm's escrow account, which were written on the following dates for the following amounts: (i) January 6, 1999 for $5800; (ii) February 26, 1999 for $4000; (iii) May 6, 1999 for $2000; (iv) May 21, 1999 for $4500; (v) June 3, 1999 for $6000; and (vi) June 16, 1999 for $5500. Cook testified that, in January 1999, Bailey had asked him if the Firm had any money in the escrow account for fees. Cook told him there was none. Cook testified that he wrote a check for $5800 from the escrow account to the operating account in January 1999 because Bailey instructed him to do so. Cook further testified that Bailey instructed him, contemporaneous to the transfer from escrow, to disburse a check from the operating account in payment of a personal obligation owed by Bailey. Although he could not recall the amount of the check or why it was written, Cook believed the check was made payable to an attorney on Market Street in Wilmington.
Cook initially testified that Bailey also directed the five later transfers from the escrow account to the operating account. Cook testified that he believed the later escrow transfers were connected in some way to five other checks written on the operating account in payment of Bailey's personal obligation. At the hearing, Cook produced copies of six cancelled checks that had been drawn on the Firm's operating account on the following dates and for the following amounts: (i) February 19, 1999 for $5000; (ii) March 10, 1999 for $5000; (iii) March 17, 1999 for $5000;[12] (iv) March 22, 1999 for $5000; (v) March 24, 1999 for $5000; and (vi) March 26, 1999 for $1500. The checks were all made payable to Maryann McConnell. Cook stated that he did not know who Maryann McConnell was.
Cook later acknowledged that, despite his belief that the six questionable escrow transfers were related to the six payments to Maryann McConnell, no such relationship appeared to exist given the dates and amounts of each respective transaction. Cook also later equivocated in his testimony concerning whether Bailey explicitly directed the five additional escrow transfers. When asked why he had never mentioned the McConnell checks to the ODC prior to the hearing, Cook testified that he did not remember having copies of the McConnell checks until he discovered them in his attic the night before he was scheduled to testify. In response to questions from the Board, Cook acknowledged that it was not his usual practice to retain copies of checks and that the McConnell checks were the only copies of checks he had taken with him when he retired. He stated that he did so because he felt the checks might be "pertinent."
Cook also produced for the first time at the hearing a purported copy of a memorandum addressed to Cook from Ben Wetzel, Bailey's law partner, dated April 5, 1999. The memorandum asked Cook whether he had made any payments out of Firm funds to Maryann McConnell. Cook stated that the memorandum, which appeared to have been drafted as an email, had been slipped under his office door. Cook testified that he had provided a confidential response to the memorandum informing Wetzel of the amount of the checks issued to McConnell and informing *859 him that Cook had designated the expenses as "legal/accounting" fees. Cook testified that he had never directly spoken to Wetzel about the questions raised in the memorandum and that he had never informed the ODC's investigator about the memorandum at the time of his interview. Cook, in fact, admitted that he had lied to the ODC's investigator when he told the investigator that he did not remember the escrow transfers and contemporaneous "deposits in transit." Cook stated that he lied about the transfers because he felt a sense of loyalty to Bailey.
The only other witness to testify at the second hearing was Lynn Atz, CPA. Atz testified that her company, Atz & Associates, had been retained by the Firm to provide accounting services on a contract basis from September 1999 to November 2000 after the Firm's in-house bookkeeper had retired. She stated that when her employees first went into the Firm, the office was in a "bit of disarray." She stated that the former bookkeeper's office was "very disorganized" and that there was "many years worth of stuff....all over the place." Atz testified that one of her employees was placed within the Firm in order to reconcile the Firm's books and records. Atz stated that, although she believed her employee was performing the reconciliations, in fact the Firm's accounts were not reconciled from December 1999 to November 2000. Her employee later admitted lying to Atz about doing the reconciliations. Atz testified that, when Bailey found out, he was surprised and very upset. Atz stated that Bailey had never asked her to make any questionable transfers from the escrow account to the operating account to meet expenses.
Following the second day of testimony, the Board scheduled a third hearing at the parties' request to allow them to expand the record and present rebuttal testimony as desired. Before the third day of testimony, the parties submitted another stipulation of facts regarding Cook's statements to the ODC and McCullough. The stipulation outlined the ODC's inability to contact Cook and reflected Cook's reluctance to speak with the ODC. The stipulation also reflected Cook's initial failure to recall any information regarding the $27,800 in transfers from the escrow account to the operating account when McCullough first questioned him, as well as Cook's later statements to ODC that he had remembered some things regarding the transactions in question but that he intended to surprise Bailey and the ODC with his testimony at the Board hearing.
The Board held a third day of testimony on February 22, 2002. The first witness to testify was Ben Wetzel, who was called by Bailey but appeared in person at the Board's direction.[13] Wetzel's testimony significantly contradicted Cook's earlier testimony. Wetzel denied drafting the April 1999 memorandum that Cook had produced. Wetzel stated that he had known since about March 1, 1999, that Bailey owed a personal debt to Maryann McConnell and that Bailey had made payments on the debt from the Firm's operating account. Wetzel testified that he became aware of the McConnell debt after he picked up a letter in the Firm's fax machine regarding the matter. He gave the fax to Bailey and discussed the issue with him. Thus, Wetzel testified, he would have had no reason to request information from Cook about payments to McConnell in April 1999.
Wetzel stated that he was not concerned about the payment of funds from the Firm's operating account towards Bailey's personal debt to McConnell. Nor did he concern himself with how the funds were expensed from the operating account. He *860 testified that he and Bailey had an informal method of distributing profits, and Wetzel just assumed that he and Bailey would work out the McConnell payments at some point in the future when they distributed profits. He had not been aware that the payments had been expensed to legal and accounting fees of the Firm.
The next witness was Pamela McCullum. McCullum had worked as Bailey's secretary for several years and also had worked as the Firm's office manager. She stated that she had trained Sam Cook after he was hired to do the bookkeeping. She testified regarding a conversation she had with Cook "sometime before the beginning of 1999" regarding the transfer of escrow funds. She stated that Bailey had walked in on their conversation, and Cook asked Bailey directly if he could transfer funds from the escrow account to the operating account in order to pay bills. McCullum testified that Bailey told Cook specifically that he could not make such a transfer because it was illegal to do so. She stated that, in the past when the Firm was short of funds in the operating account, the Firm's practice was for Bailey to make a few calls to collect on debts owed to the Firm. She did not recall telling Cook this information, however, during their conversation about escrow transfers. McCullum further testified that Bailey had never instructed her or anyone in her presence to make an improper transfer from the escrow account.
The next witness to testify was Jan Moreland, the Firm's present bookkeeper who replaced the first bookkeeper from Atz & Associates. Moreland testified that she initially came to the Firm in November 2000 as an employee of Atz & Associates to reconcile the Firm's books and records in anticipation of the upcoming Lawyers' Fund audit. She testified that within a week of starting at the Firm, she discovered that the Firm's books had not been reconciled since June of 1999. She also discovered the non-existent "deposits in transit" from early 1999. She stated that when she shared this information with Bailey, he was very surprised and angry. She testified that Bailey has never instructed her to make any improper transfers from the escrow account.
Bailey was the last witness to testify. He testified regarding his relationship to Maryann McConnell and his loan obligation to her. He stated that McConnell was a friend and neighbor whom he had dated briefly. She had made a personal loan to him of $30,000. When their relationship ended, they had an agreement for Bailey to repay the loan very promptly in $5000 weekly installments.[14] He testified regarding his conversation with Wetzel about repaying the McConnell debt from the Firm's operating account. His testimony agreed with Wetzel's regarding the informality of their accounting to each other as partners. Bailey specifically denied that he ever directed Cook to transfer money from the escrow account to the operating account to pay any expenses or to cover shortages in the operating account. He testified that Cook had never informed him that the Firm was having difficulties meeting its financial obligations. Nor did Cook tell him that there were insufficient funds in the operating account to cover the checks to McConnell. Bailey again expressed remorse and accepted responsibility for the past delinquencies in the Firm's bookkeeping functions and the Firm's past tax delinquencies.

*861 The Board's Decision

After considering all of the evidence presented, the Board, in a 49-page opinion, rejected the stipulation and recommended sanction of a public reprimand and probation. The Board acknowledged that Cook's "demeanor did not leave the Board with great confidence in his credibility to the extent that his testimony stood alone and was not corroborated directly or indirectly." Nonetheless, the Board found clear and convincing evidence that Bailey's misconduct was intentional, knowing or at least reckless based on the following facts:
(a) There were not funds in the trust account against which each of these trust checks could properly be drawn;
(b) Cook "covered" each such check by a notation of a "deposit in transit;"
(c) Cook was merely the firm's bookkeeper and had no direct stake in the financial success of the firm, and thus no motive to act improperly on his own;
(d) During the period January-July 1999, the Firm's operating account was plagued with repeat overdraft balances;
(e) The "deposit in transit" necessary to cover the $27,800 in improper withdrawals from the firm's trust account was never made to the account until November 2000 at the time of the first audit; and
(f) Bailey admitted that he had asked Cook to write the checks to McConnell for his personal debt but could not explain why he had not had the firm's check made payable directly to him so that he could use a personal check to pay McConnell. Although the checks were income to Bailey or at least a loan to Bailey from the corporation, Bailey could not explain why the checks were booked as "legal/accounting" expenses, and he could not explain how he intended to properly account for the checks to his partner.
Specifically, the Board stated in its opinion:
Even if we credit Bailey and discredit Cook in terms of their testimony regarding whether Bailey explicitly directed Cook to invade client trust funds, the fact remains that Bailey knowingly caused $26,500 in personal expenses to be satisfied by extraordinary charges against the Firm operating account over and above his normal draw. If the operating account were repeatedly in an overdraft condition anyway, Bailey had to know that a natural consequence of his acts was that money had to be moved from some account to cover these draws. The only account of which we are aware that could have provided the money was the trust account. As managing partner, Bailey had to know that there were insufficient firm funds in the trust account to cure any overdraft balances, otherwise, firm funds could simply have been moved to cover the overdraft balances in the operating account. Hence, Bailey knew (at least insofar as one is presumed to intend the natural and probable consequences of his acts), that by the extraordinary expenditure of funds to satisfy the McConnell debt, client trust funds would have to be, and were, invaded.
The Board concluded that "Cook would not have acted improperly without Bailey's knowledge and direction, including his invasion of client trust funds." Based on its finding of knowing misconduct, the Board found Bailey's case distinguishable from the disciplinary cases cited by the parties as precedent. The Board found that the decisions in In re Benson[15] and In re Macpherson-Johnson,[16] both of which resulted in public reprimands to the respondents, *862 did not involve misappropriation of client trust funds or reckless behavior and, thus, did not control the outcome of Bailey's case.
Instead, the Board concluded that Bailey's case was more analogous to In re Figliola.[17] Figliola had been found in violation of several disciplinary rules based upon his diversion of certain earned fees of his firm for his personal benefit and for improperly disbursing trust funds belonging to one client to satisfy a judgment for another client. Despite substantial mitigating factors, including Figliola's lack of a prior disciplinary record, his cooperation with the ODC, and his complete restitution of the funds in question, this Court ordered Figliola to be suspended for six months and a day.[18]
In Bailey's case, the Board found the precedent in In re Figliola didactic. Based upon its finding of clear and convincing evidence that Bailey's misconduct was "intentional or, at least, reckless," the Board concluded that Bailey should be suspended for a period of six months and a day followed by a three-year period of probation.[19]

Parties' Contentions on Appeal
Both Bailey and the ODC have filed objections to the Board's Report and Recommendation. Bailey raises three arguments in support of his objections: (i) the Board proceedings violated his right to due process; (ii) the Board's finding of intentional or knowing misconduct is not supported by substantial evidence; and (iii) even if this Court sustains the Board's factual findings, the recommended sanction of suspension is not consistent with the ABA Standards or Delaware precedent. The ODC agrees with Bailey's latter two contentions but disputes the former.
After considering the parties' respective positions, the Court requested the Lawyers' Fund for Client Protection (the Lawyers' Fund) to file an amicus brief addressing two questions: (1) What is the responsibility of the managing partner of a law firm to know the status of that firm's books and records, particularly under Rule 1.15 of the DLRPC? and (2) Is the sanction recommended by the Board appropriate?
The Lawyers' Fund, without addressing the propriety of the Board's specific findings in Bailey's case, contends in its briefing that: (i) the managing partner of a law firm is responsible for the integrity of the firm's books and records, including compliance with Rule 1.15; and (ii) if Bailey intentionally or knowingly failed to fulfill his responsibilities as managing partner, then the Board's recommended sanction is appropriate, absent mitigating circumstances.

Supreme Court Review
This Court has an obligation to review the record independently and determine whether there is substantial evidence to support the Board's factual findings.[20] The Board's conclusions of law are subject to de novo review. We address Bailey's claims seriatim.

A. Due Process

With respect to his due process claim, Bailey asserts that the Board's extensive examination of witnesses exceeded *863 the proper scope of permissive questioning by the Board and deprived Bailey of his right to a full adversarial hearing. As a result, Bailey contends, the Board's findings and recommendation were an abuse of the Board's discretion and should be disregarded by the Court.
In the first instance, we note that Bailey did not raise these objections to the Board's proceedings below.[21] Moreover, there is simply no legal support for Bailey's position. Disciplinary proceedings are sui generis[22] and are only governed by the Superior Court Rules of Civil Procedure to the extent practicable.[23] Accordingly, we find Bailey's citation to case law involving civil and criminal jury trials to be unpersuasive.
In this case, Bailey and the ODC presented a stipulated set of facts. It was the Board's responsibility to test the stipulation and satisfy itself that the record, in fact, supported the stipulation. To the extent the Board had questions about the stipulated facts, it was the Board's obligation to resolve those questions of fact by requesting any additional information it deemed appropriate to make a well-reasoned adjudication. Bailey was given every opportunity to present evidence in support of the stipulation. The Board raised its concerns to the parties and requested additional information. The additional information was presented, and the parties were given the opportunity to respond and to present rebuttal testimony and argument in support of the stipulation. Under these circumstances, there is no merit to Bailey's contention that the Board proceedings denied him due process.[24]

B. Knowing Misconduct

Bailey next contends, and the ODC agrees, that the record does not support the Board's finding of knowing misconduct. The crux of the parties' argument is that the only evidence to support a finding of knowing misconduct was Cook's testimony, which was not credible. Both parties assert that Cook's knowing invasion of client trust funds cannot, under the circumstances presented, be attributed to Bailey. At most, the parties argue, Bailey was negligent in failing to heed the risks that Cook might knowingly invade client trust funds.
We must independently review the record to determine if there is clear and convincing evidence to support a finding of knowing misconduct.[25] Clear and convincing evidence is evidence that produces an abiding conviction that the truth of the contentions is "highly probable." Under the DLRPC, "knowing" misconduct denotes "actual knowledge of the fact in question."[26] Because a person is presumed to intend the natural consequences of his or her actions, we have held that "knowing" misconduct may be inferred from the circumstances.[27]
We find substantial evidence in the record to support a finding of Bailey's knowing *864 misconduct for several reasons. First, Cook testified unequivocally that Bailey instructed him on at least one occasion to transfer escrow funds to the operating account. This unqualified, sworn statement, even in light of the other inconsistencies in Cook's testimony and the contrary testimony of Bailey and others, serves as clear and convincing evidence to support the Board's finding that Bailey engaged in knowing misconduct. It was well within the purview of the Board to accept a portion of Cook's testimony and to reject any inconsistent testimony.[28]
Second, as the Board pointed out, Cook's testimony was not the only evidence of Bailey's knowing misconduct with respect to the invasion of client trust funds. The stipulated facts reflected that the Firm's operating account was repeatedly in an overdraft condition over an extended period of time. Bailey, as the managing partner, knew or should have known of the Firm's financial difficulties. Notwithstanding the overdrafts plaguing the Firm's operating account, Bailey knowingly directed $26,500 in personal expenses to be satisfied by charges against the Firm's operating account. Bailey should have known that payment of these extraordinary expenditures for personal reasons would cause the Firm to fall even further behind in meeting its own financial obligations and would necessitate transferring funds into the operating account to cover Firm expenses. The record reflects that the escrow account was the only viable source of funds to cover the operating account shortfalls.
Consequently, we find substantial evidence to support the Board's conclusion that, "Bailey knew (at least insofar as one is presumed to intend the natural and probable consequences of his acts), that by the extraordinary expenditure of funds to satisfy the McConnell debt, client trust funds would have to be, and were, invaded."
Finally, even if we concluded there was no evidence that Bailey explicitly or implicitly directed the invasion of client trust funds, we still find clear and convincing evidence on this record that Bailey engaged in knowing misconduct. We agree with the Lawyers' Fund's assertion that the "sustained and systematic failure"[29] of a managing partner to supervise a firm's employees to ensure compliance with Rule 1.15 may not be characterized as simple negligence.[30] A lawyer who accepts responsibility for the administrative *865 operations of a law firm stands in a position of trust vis-à-vis other lawyers and employees of the firm. The managing partner must discharge those responsibilities faithfully and diligently.[31]
Although a managing partner cannot guarantee absolutely the integrity of the firm's books and records, it is the managing partner's responsibility to implement reasonable safeguards to ensure that the firm is meeting its obligations with respect to its books and records.[32] As the Lawyers' Fund points out, meeting these responsibilities need not pose an onerous burden for the managing partner.[33] It is, however, a serious responsibility. This Court has emphasized the importance of a lawyer's obligation to maintain accurate books and records and the serious risks of harm to the lawyer's clients that arise when a lawyer fails to act consistently with this obligation. The record reflects that Bailey knowingly failed to exercise even a modicum of diligence in supervising the maintenance of the Firm's books and records and that his indifference and inattention endured without correction until the Lawyers' Fund audit. Had Bailey attempted to exercise any controls over the maintenance of the Firm's books and records, the invasion of client trust funds could easily have been avoided or, at the very least, timely rectified.

C. Appropriate Sanction

Bailey's final argument, which the ODC concedes, is that, even if this *866 Court upholds the Board's factual findings, the Board's recommended sanction of suspension is not supported by either the ABA Standards for Imposing Lawyer Discipline ("ABA Standards") or prior Delaware cases. As the parties point out, while the Board's recommendation on the appropriate sanction is helpful to the Court, it is not binding.[34] The Court has wide latitude in determining the form of discipline, and we will review the recommended sanction to ensure that it is appropriate, fair and consistent with our prior disciplinary decisions.[35]
The objectives of the lawyer disciplinary system are to protect the public, to protect the administration of justice, to preserve confidence in the legal profession, and to deter other lawyers from similar misconduct.[36] To further these objectives and to promote consistency and predictability in the imposition of disciplinary sanctions, the Court looks to the ABA Standards for Imposing Lawyer Sanctions as a model for determining the appropriate discipline warranted under the circumstances of each case.[37] The ABA framework consists of four key factors to be considered by the Court: (a) the ethical duty violated; (b) the lawyer's mental state; (c) the extent of the actual or potential injury caused by the lawyer's misconduct; and (d) aggravating and mitigating factors.[38]
Bailey's misconduct in this case violated his duties to his clients, to the lawyers and employees of the Firm, to the legal system, and to the profession. His sustained and systematic failure to exercise even a modicum of diligence with respect his recordkeeping and tax obligations reflected a knowing disregard of his duties as managing partner and created the potential for serious injury.
As an initial matter, therefore, we conclude that ABA Standard 4.12 applies, in the absence of aggravating or mitigating circumstances. ABA Standard 4.12 provides: "Suspension is generally appropriate when a lawyer knows or should know that he is dealing improperly with client property and causes injury or potential injury to a client." Having concluded that suspension appears to be warranted, the Court now must consider any aggravating or mitigating factors that might compel us to impose a greater or lesser sanction.[39]
The parties stipulated that Bailey's substantial experience in the practice of law and his pattern of misconduct were both aggravating factors in this case. The stipulated mitigating factors were Bailey's lack of a prior disciplinary record, his extensive remedial efforts, his cooperation with the disciplinary process, the imposition of other penalties (penalties and interests of taxing authority and substantial costs of remedial efforts), and his remorse.
Although the stipulated mitigating factors are greater in number, we conclude they do not outweigh the aggravating factors in order to justify a lesser sanction than suspension.[40] Bailey's sustained and systematic disregard for his obligations was not, as the parties argue, mere negligence. His knowing misconduct created palpable risks of serious harm to his *867 clients and to others in his Firm who relied upon him to discharge his responsibilities in a diligent manner. We are unpersuaded that a lesser sanction than suspension is justified because serious harm did not actually result.
Moreover, we find that the sanction of suspension is more consistent with our relevant prior precedent. We agree with the Board's conclusion that Bailey's position as managing partner and his knowing misconduct, which caused the invasion of client trust funds, distinguish this case from this Court's prior decisions imposing public reprimands for bookkeeping and related rule violations.[41] We with the Board that Bailey's case is more analogous to the case of In re Figliola.[42] Like Figliola, Bailey has no prior disciplinary record, has made full restitution, and has cooperated fully with the ODC. Notwithstanding these substantial mitigating factors, however, we concluded that Figliola should be suspended for six months and one day given his "knowing and reckless misappropriation of Firm and client funds."[43] We find the same sanction appropriate here.

Conclusion
For the foregoing reasons, Bailey shall be suspended from the practice of law for a period of six months and one day beginning June 1, 2003. Bailey may seek reinstatement on or after December 1, 2003. If Bailey seeks reinstatement, a panel of the Board should determine at that time whether further probation is appropriate and, if appropriate, whether conditions should attach. Pursuant to Supreme Court Rule 18, the time within which a motion for reargument may be filed in this matter is shortened to seven days from the date of this Opinion.
NOTES
[1] Sitting by designation pursuant to Art. IV, §§ 12 and 38 of the Delaware Constitution and Supreme Court Rules 2 and 4.
[2] The parties' stipulation reflected that the Firm's federal employment payroll taxes are required to be filed and paid on a quarterly basis by the end of the month following the quarter in which they were withheld. Funds for the payment of this obligation are to be deposited monthly into a Tax Deposit Account.
[3] Specifically, Bailey had hired an outside accountant to perform a monthly review and oversight of the reconciliation of the Firm's books by its in-house bookkeeper. Bailey also had engaged the same accountant to prepare both the Firm's corporate tax returns and Bailey's personal tax returns. Bailey also had applied for (and later obtained) a personal loan in excess of $100,000 in order to pay off the Firm's outstanding federal payroll tax debt.
[4] DEL. LAWYERS' R. PROF. CONDUCT Rule 1.15(a) provides, in part: "A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property....Funds of the lawyer that are reasonably sufficient to pay bank charges may be deposited [in the escrow account]; however, such amount may not exceed $500 and must be separately stated and accounted for...." Bailey admitted violating Rule 1.15(a) by keeping over $1700 of the Firm's funds in the client escrow account for almost a year.
[5] DEL. LAWYERS' R. PROF. CONDUCT Rule 1.15(b) provides, in part, that "a lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall promptly render a full accounting regarding such property." Bailey admitted violating Rule 1.15(b) by failing to promptly pay various federal, state, and city employee and employer payroll taxes from 1999 to June 2001.
[6] DEL. LAWYERS' R. PROF. CONDUCT Rule 1.15(d) provides specific, detailed requirements for the maintenance of a lawyer's books and records. Bailey admitted violating Rule 1.15(d) by failing, for almost a year, to maintain the Firm's books and records in compliance with the rule's requirements.
[7] DEL. LAWYERS' R. PROF. CONDUCT Rule 5.3(b) provides, in part, that a lawyer supervising a nonlawyer "shall make reasonable efforts to ensure that the [nonlawyer's] conduct is compatible with the professional obligations of the lawyer." Moreover, Rule 5.3(c) provides in part that a lawyer shall be responsible for a nonlawyer's misconduct if the lawyer "ratifies the conduct" or the lawyer "knows of the conduct at a time when its consequences can be avoided or mitigated but fails to take reasonable remedial action." Bailey admitted violating Rule 5.3 by failing to have reasonable safeguards in place to ensure an accurate accounting of his financial books and records in compliance with the Rules, by failing to supervise his employees' conduct in reconciling his books and records and filing and paying payroll taxes, and by knowing that payroll, gross receipts, and corporate taxes were not being timely filed and paid.
[8] DEL. LAWYERS' R. PROF. CONDUCT Rule 8.4(c) provides that it is professional misconduct for a lawyer to "engage in conduct involving dishonesty, fraud, deceit, or misrepresentation." Bailey admitted violating Rule 8.4(c) by filing a Certificate of Compliance with this Court for the year 2000, which falsely stated that Bailey's law practice books and records were maintained in compliance with Rule 1.15 and by falsely stating on his Certificates of Compliance for 1998, 1999, and 2000 that he was meeting his tax filing and payment obligations.
[9] DEL. LAWYERS' R. PROF. CONDUCT Rule 8.4(d) provides that it is professional misconduct for a lawyer to "engage in conduct that is prejudicial to the administration of justice." Bailey admitted violating Rule 8.4(d) by failing to file and pay various taxes and by filing false Certificates of Compliance for the years 1997, 1998, 1999, 2000, and 2001.
[10] Bailey stated that he first became aware of the transfers following the first Lawyers' Fund audit in November 2000. In response, he immediately deposited $27,800.00 into the escrow account to cover the checks written in 1999.
[11] The ODC previously had declined to call Cook as a witness because he was not cooperative with the ODC's investigation and had previously given inconsistent statements to the ODC's investigator.
[12] The March 17, 1999 check included a handwritten notation: "Thank you so much for a company check since your personal check bounced." Cook testified that the notation was not his handwriting.
[13] Bailey initially had proffered Wetzel's testimony via affidavit.
[14] Following the hearing, the ODC and Bailey filed a posthearing stipulation reflecting that Bailey's first $5000 payment to Maryann McConnell came from Bailey's personal account, which contradicted Cook's testimony regarding the first payment being made directly to McConnell's attorney from the Firm's operating account.
[15] 774 A.2d 258 (Del.2001).
[16] 2001 WL 760866 (Del. June 14, 2001).
[17] 652 A.2d 1071 (Del.1995).
[18] Id. at 1077.
[19] The Board's opinion reflects that the Board, in fact, had considered recommending a lengthier suspension.
[20] In re Reardon, 759 A.2d 568, 575 (Del. 2000).
[21] DEL. SUPR. CT. R. 8.
[22] DEL. LAWYERS' R. DISCIPLINARY PROC. 15(a).
[23] Id. Rule 15(b).
[24] Cf. In re Kennedy, 472 A.2d 1317, 1328 (Del.1984) (finding no due process violations in lawyer disciplinary proceeding when Board members charged with investigating a lawyer's misconduct were later involved in adjudicating different allegations of misconduct), cert. denied, 467 U.S. 1205, 104 S.Ct. 2388, 81 L.Ed.2d 346 (1984).
[25] In re Rowe, 566 A.2d 1001, 1006 (Del.Jud. 1989).
[26] DEL. LAWYERS' R. PROF. CONDUCT Terminology.
[27] In re Lassen, 672 A.2d 988, 996 n. 9 (Del. 1996).
[28] See Tyre v. State, 412 A.2d 326, 330 (Del. 1980).
[29] In re Caremark Int'l, Inc. Derivative Litig., 698 A.2d 959, 971 (Del.Ch.1996).
[30] The ODC appears to agree with this assertion as a general proposition, although the ODC disputes that it applies in Bailey's case. For many years, every Delaware lawyer has been required to file a Certificate of Compliance as part of Annual Registration. The current direction from the Supreme Court to each member of the Bar, which is representative of the form used in previous years states, in part:

The Certificate of Compliance is a component of the ... Annual Registration Statement. The purpose of the Certificate is to make lawyers more aware of record-keeping requirements and to increase compliance with Rule 1.15 of the Delaware Lawyers' Rules of Professional Conduct....
Lawyers should be aware that their Certificates of Compliance to the Delaware Supreme Court are personal statements from each Delaware lawyer.... [A]ll Delaware law firms are urged to implement, as well as formally document, the necessary internal procedures so that all lawyers at such firms can make the appropriate certifications. For example, if the managing partner of a law firm personally certifies to all of its lawyers that the firm is in compliance, it would generally be reasonable for such lawyers to complete the Certificate in reliance upon the managing partner's certification....
The Certificate of Compliance by the Managing Partner states:
This Certificate of Compliance and the Banking and Recordkeeping section (page 5) are being completed in reliance upon the certification of the managing partner of my law firm that my firm is in compliance. Yes____ No____ Name of Managing Partner:______
The provisions listed above are not intended to be all-inclusive. The Delaware Lawyers' Rules of Professional Conduct should be reviewed in their entirety to make certain that you are in compliance with all of their provisions.
[31] The responsibilities placed on a managing partner under the Delaware Lawyers' Rules of Professional Conduct currently in effect are consistent with the new Rules, including Rule 5.1 of the new Rules that will become effective July 1, 2003. These new Rules were promulgated by this Court by Order dated April 29, 2003. New Rule 5.1 refers to lawyers in a firm who have "managerial authority." Comment [2] of new Rule 5.1 that will become effective on July 1, 2003, provides:

Paragraph (a) requires lawyers with managerial authority within a firm to make reasonable efforts to establish internal policies and procedures designed to provide reasonable assurance that all lawyers in the firm will conform to the Rules of Professional Conduct. Such policies and procedures include those designed to detect and resolve conflicts of interest, identify dates by which actions must be taken in pending matters, account for client funds and property and ensure that inexperienced lawyers are properly supervised.
[32] See In re Irizarry, 141 N.J. 189, 661 A.2d 275, 277 (1995) ("An attorney's duty to preserve clients' funds ... is nondelegable. Lawyers may not absolve themselves of the misappropriation of funds by delegating to employees the authority to complete signed checks and then failing to supervise those employees.").
[33] In its brief, the Lawyers' Fund points out several simple, common-sense tools that a managing partner may employ to fulfill his or her supervisory duties, such as periodic review of employee performance, employing outside auditors, implementing operational systems to ensure as far as practicable compliance with the Rules, and requiring co-signatures on any escrow check in order to control access to the account. Prior to the Lawyers' Fund audit, Bailey had no system for overseeing the Firm's bookkeeping functions other than "eyeballing" records on an ad hoc basis. For someone who professed no understanding of bookkeeping, it defies logic that Bailey relied only on his own "eyeball" checks to ensure compliance with his bookkeeping obligations.
[34] In re Mekler, 669 A.2d 655, 668 (Del.1995).
[35] See In re Reardon, 759 A.2d 568, 580 (Del. 2000).
[36] In re Figliola, 652 A.2d 1071, 1076 (Del. 1995).
[37] In re Reardon, 759 A.2d at 575-76.
[38] In re Lassen, Del.Supr., 672 A.2d 988, 998 (1996).
[39] In re Reardon, 759 A.2d at 577-78.
[40] See In re Howard, 765 A.2d 39, 44 (Del. 2000).
[41] See, e.g., In re Benson, 774 A.2d 258 (Del. 2001); In re Macpherson-Johnson, 2001 WL 760866 (Del. June 14, 2001).
[42] 652 A.2d 1071 (Del.1995).
[43] Id. at 1077.