In the Matter of a Member of the Bar of the Supreme Court of Delaware, Darryl K. FOUNTAIN, Respondent.

No. 471, 2006.

Board Case Nos. 30, 2005

1, 2 and 3, 2006.

Supreme Court of Delaware.

Submitted: Nov. 8, 2006.

Decided: Dec. 1, 2006.

James E. Liguori, Liguori, Morris, Yienst, Dover, DE, for Darryl K. Fountain.

Patricia Bartley Schwartz, Office of Disciplinary Counsel, Wilmington, DE.

Before HOLLAND, BERGER and JACOBS, Justices.

PER CURIAM:

This is an attorney disciplinary matter directed to charges of professional misconduct against Darryl K. Fountain, the Respondent. The report of the Board on Professional Responsibility (the "Board")

concluded that Fountain knowingly misappropriated client funds by depositing unearned retainers into his operating account, by refusing to refund unearned retainers and by converting to his own use the Medicaid reimbursement payment of one client ("Board Report"). As a result of Fountain's ethical violations, the Delaware Lawyers' Fund for Client Protection ("LFCP") has paid out more than $100,000 in claims. In this opinion, we approve the Board's recommendation that Fountain be disbarred.

### Vacatur Properly Denied [1]

■ The Petition for Discipline was filed on April 5, 2006, and Fountain's answer was due no later than April 26, 2006. Fountain did not file a timely answer nor did he seek an extension of time to file an answer. Accordingly, on April 27, 2006, the Office of Disciplinary Counsel ("ODC") made a written request that the allegations and charges set forth in the Petition be deemed admitted pursuant to Rule 9(d)(2) of the Delaware Lawyers Rules of Disciplinary Procedure. Fountain did not oppose this request or otherwise respond to it. On May 8, 2006, the Chair of the Panel (the "Chair") wrote to the parties advising that the allegations in the Petition were deemed admitted because no answer or request for an extension of time to answer had been filed.

On May 26, 2006, Fountain sent a letter to the Chair requesting that the deemed admission be vacated. Fountain stated that he had recently been released from the hospital for treatment of an ulcer. He did not, however, provide the dates or any evidence of his hospitalization, nor did he provide any medical documentation that he was unable to respond to the Petition. Fountain also submitted a proposed Answer.

ODC objected to Fountain's request to vacate. On June 5, 2006, the Chair sent a letter denying the request to vacate the deemed admissions. The Chair explained that under Procedural Rule 9(d)(2), the failure to file a timely answer required that the allegations and charges in the Petition be deemed admitted. Specifically, Rule 9(d)(2) states in pertinent part:

> In the event the Respondent fails to serve an answer within the prescribed time, all of the allegations and charges in the petition *shall* be deemed admitted, such that the sole remaining issue to be determined by the Board shall be the appropriate disciplinary sanction. (Emphasis added).

In addition, the Chair noted that Fountain had not submitted any proof of his hospitalization or other evidence of the health problems which he had cited as the reasons for his failure to file a timely answer. Accordingly, even if the Chair had discretion under Procedural Rule 9(d)(2), the request to vacate would have been denied.

On June 16, 2006, Fountain filed a Motion for Reargument in Support of Vacating the Default Judgment. On June 21, 2006, the Chair denied the Motion for Reargument, again explaining that Rule 9(d)(2) used the mandatory word "shall" and not the permissive word "may." In addition, the Chair explained that even if Procedural Rule 9(d)(2) gave the Chair discretion, Fountain had still not submitted any medical evidence supporting his claim that he was unable either to timely answer the Petition or to request an extension.

Fountain has filed objections to the Board's Report on the basis of its decision to deny his application for vacatur. We have concluded that Fountain's objections

1. This procedural history is taken almost verbatim from the Board's Report.

are without merit. The Board's decision to deny Fountain's application for vacatur is supported by the record and is the product of an orderly reasoning process.

## Facts [2]

Fountain was admitted to the Bar of the Supreme Court of Delaware in 1984.[3] At all relevant times, Fountain was engaged in the private practice of law with an office in Wilmington.

### Board Case No. 30, 2005(ODC)

On July 11, 2005, Fountain was suspended for three years from the practice of law. The suspension was based on a "multi-year failure to maintain proper books and records and safeguard client funds; a failure to timely file and pay personal state and federal income taxes; and a ten-year failure to accurately report the status of his books and records on his Certificates of Compliance." [4]

By Order of the Court of Chancery dated July 14, 2005, Randolph K. Herndon, Esquire, was appointed Receiver of Fountain's law practice. He took immediate control of Fountain's law firm files, books and records, and bank accounts. The negative balance in Fountain's operating account on July 14, 2005 was (−)$1,677.77, and the balance in his escrow account was $33.50.

On July 17, 2005, Mr. Herndon met with Fountain to discuss the client files and accounts. During this discussion, Fountain told Mr. Herndon that there was potentially $46,000 of unearned fees and other funds that Fountain owed to approximately 22 clients.

At the request of ODC, Joseph McCullough, auditor for the LFCP, conducted an audit of Fountain's law practice to determine how funds were received into the practice and how the funds were withdrawn. Mr. McCullough selected three client matters, which he detailed in his audit report, that are indicative of Fountain's practices in handling money coming into the firm. These client matters indicate that large retainer checks would either be (1) cashed; (2) deposited into Fountain's operating account and the entire amount withdrawn the following day or very shortly thereafter; or (3) deposited into Fountain's escrow account and the entire amount withdrawn the following day or very shortly thereafter.

Mr. McCullough also reviewed various Internal Revenue Service ("IRS") notices received by the Receiver which revealed that the IRS had no record of Fountain having filed or paid taxes for the tax years 1998, 1999, 2002 and 2003. Mr. McCullough also reviewed numerous W–2G forms showing that Fountain had amassed over $617,000 in gambling proceeds from 1999–2004. In two previous audits conducted by the LFCP, on April 2, 2004 and September 1, 2004, respectively, Fountain indicated that he had not filed his 2002 federal and state tax returns. He did not mention, however, that he had not filed tax returns for the years 1998, 1999 and 2003.

### Board Case No. 1, 2006 (Bernadeane Thompson)

In July 2004, Bernadeane Thompson retained Fountain to represent her in a creditor matter involving her business, B & B Container. On July 15, 2004, Ms. Thompson gave Fountain two checks. One check in the amount of $12,500 was to be used to pay a creditor, Center Capital Corporation. A lump sum payment of $10,000 would be paid to reduce the debt owed to

---

**2.** These facts are taken almost verbatim from the Board's Report.

**3.** *In re Fountain,* 878 A.2d 1167, 1168 (Del. 2005).

**4.** *In re Fountain,* 878 A.2d at 1174.

this creditor. The remaining $2,500 was to be Fountain's flat fee for handling the matter. The second check was in the amount of $2,500 and was to be a down payment on a $5,000 retainer to Fountain for future legal services which, Fountain said, would "keep the wolves from [her] door."

On July 16, 2004, Fountain cashed Ms. Thompson's $12,500 check at her bank, Wachovia Bank. On July 19, 2004, Fountain deposited the $2,500 check into his escrow account. Ms. Thompson made two more check payments to Fountain to complete the $5,000 retainer. The first check, issued on July 26, 2004, was in the amount of $1,000 and was cashed by Fountain on the same day at Wachovia Bank. The second check, issued on August 5, 2004, in the amount of $1,500, was cashed by Fountain on August 9, 2004 at Wachovia Bank.

On December 10, 2004, Fountain called Ms. Thompson regarding a new security agreement on her loan with Center Capital. She signed the agreement on that day. The agreement provided for new loan terms and a lump sum payment of $7,000 on her existing debt. Fountain explained that he had been able to negotiate the intended $10,000 lump sum payment down to $7,000. Ms. Thompson understood that the $3,000 difference would be deposited into Fountain's escrow account and used for future legal services. The $3,000 was never returned to Ms. Thompson, nor was she ever provided any type of statement showing how it was used. Nor did Ms. Thompson ever receive any statement showing how the $5,000 retainer was used.

In early 2005, Ms. Thompson received a subpoena to appear in Superior Court on January 28, 2005, in the matter of *Center Capital v. B & B Container, Inc. and Bernadeane Thompson,* and to produce proof of payment or attempted payment to Center Capital. Center Capital had not received her signed security agreement or any lump sum payment. Ms. Thompson was then presented with another security agreement to sign, which she did, and then forwarded it to Fountain's office. On March 16, 2005, Fountain paid Center Capital $7,000 on Ms. Thompson's behalf.

On June 14, 2005, Ms. Thompson terminated Fountain's representation and requested an accounting of the use of her funds, as well as a refund of any unused funds. Ms. Thompson sent numerous faxes to Fountain requesting an accounting and a refund. Each fax was answered by a fax from Fountain saying that he did a lot of work for Ms. Thompson and that he would refund the balance of the Center Capital advance. No accounting was provided and no monies were refunded.

On July 20, 2005, Ms. Thompson filed a claim with the LFCP for $8,900, consisting of (1) $3,000 representing the portion of the $12,500 check never used to pay Center Capital; (2) the $5,000 retainer paid to represent her in future matters; and (3) an additional $900 which Fountain had received as a refund to Ms. Thompson from another attorney. After an investigation by the LFCP, this claim was paid in full on October 17, 2005.

*Case No. 2, 2006 (Vera Ann Smack)*

Vera Smack retained Fountain to represent her in a personal injury matter in 1998. She did not receive a contingency fee agreement at any time during the representation. Ms. Smack's claim was settled on March 26, 2004. Her settlement statement indicated that the total recovery was $32,500 and that Fountain was receiving a "Discounted Attorneys Fee" of $7,500 plus costs from her settlement. Ms. Smack received $14,095.37. A total of $10,000 was to be held by Fountain in the event of a worker's compensation lien on the proceeds.

Fountain released an additional $5,000 to Ms. Smack following the final settlement. Fountain continued to hold $5,000 on behalf of Ms. Smack or the worker's compensation carrier. By letter to Fountain dated April 18, 2005, Ms. Smack informed Fountain that the worker's compensation carrier case was closed, and she requested that the remaining $5,000 be disbursed to her. By letter dated May 26, 2005, Fountain advised Ms. Smack that she was not entitled to the $5,000. He said that she was entitled only to $2,000 and that he would take the remainder as attorney's fees. By letter dated June 8, 2005, Ms. Smack advised Fountain that she did not agree to an increased attorney's fee. Nevertheless, Fountain did not forward any further funds to her.

### Case No. 3, 2006 (Michael Lacy)

In July 2004, Michael Lacy retained Todd Edward Henry, Esquire of the Henry Law Firm to represent him in criminal matters in Delaware. Todd Edward Henry, Esquire, is not a member of the Delaware Bar. Mr. Henry contacted Fountain to refer Mr. Lacy's criminal matters to local counsel. Mr. Henry believed that Fountain would attempt to negotiate a guilty plea on Mr. Lacy's behalf in two criminal matters. If a plea could not be negotiated, Fountain would move Mr. Henry's admission pro hac vice.

On October 25, 2004, Mr. Henry, pursuant to Fountain's instructions, deposited $1,000 into Fountain's operating account at PNC Bank. Fountain entered his appearance in one of Mr. Lacy's criminal matters on November 19, 2004. Mr. Henry made two subsequent deposits into Fountain's PNC operating account: $1,000 on March 11, 2005, and $500 on April 25, 2005.

On December 23, 2004, Mr. Lacy was arrested on a third set of charges. The Public Defender's Office entered an appearance for Mr. Lacy on those charges and on a set of prior charges. The State of Delaware was willing to negotiate a plea for all of Mr. Lacy's outstanding criminal matters, and the Public Defender made several unsuccessful attempts to contact Fountain regarding the State's plea offer. Fountain never met with Mr. Lacy. He did not attempt to conduct discovery. He did attempt to file a pro hac vice admission motion on Mr. Henry's behalf, but it was not ruled upon by the court as it was in the wrong form. Ultimately, the Public Defender's Office negotiated a plea to all pending criminal charges against Mr. Lacy. As part of the plea package, the charges for which Fountain had been hired to represent Mr. Lacy were *nolle prossed.* Mr. Lacy entered his plea on April 13, 2005, at a hearing in Superior Court at which Fountain was ordered to be present.

On November 14, 2005, Mr. Lacy filed a claim with the LFCP for reimbursement of the monies paid to Mr. Henry for Fountain's legal services. After investigation, the LFCP reimbursed Mr. Lacy $2,500.

### Sanctions Hearing [5]

After the allegations in the Petition were deemed admitted, the Board convened on June 28, 2006, to hear testimony with respect to sanctions. The ODC called the following witnesses: Randolph K. Herndon, the Receiver for Fountain's law practice; Joseph McCullough, the auditor for the LFCP; Bernadeane Thompson, a former client of Fountain, and Marvin A. Davis, Jr., another former client. Fountain was present at the hearing and represented by James E. Liguori, Esquire. Fountain did not call any witnesses or present other evidence.

Four witnesses testified at the hearing on sanctions. Mr. Herndon testified about

---

**5.** This recitation is taken almost verbatim from the Board's Report.

his efforts to identify Fountain's clients and trace retainers those clients had paid to Fountain. At a meeting with Fountain on July 17, 2005, Fountain admitted to Mr. Herndon that there were several clients who had provided Fountain with retainers, portions of which remained "unearned." This was troubling to the Receiver, because Fountain's escrow account had a very minimal balance and his operating account had a negative balance. Mr. Herndon testified that these unearned fees totaled approximately $46,000.[6]

Mr. Herndon also testified that during June 2005, Fountain had collected approximately $20,000 in retainers from eight clients, but no work had been done on most of these client files. According to Mr. Herndon, Fountain had essentially "checked out," and the little work that was done in June 2005, was performed by a legal assistant. Fountain missed one or two hearings and missed some filing deadlines. During this time, Fountain was making frequent ATM cash withdrawals from his operating account, often from ATM machines at Dover Downs.

Mr. Herndon described several instances where, based on his review of client files and Fountain's bank records, Fountain had kept unearned retainers. For example, Mr. Herndon described a situation involving a client named Joe Young, who had paid a $10,000 retainer to Fountain in December 2004. Fountain told Mr. Herndon that $5,000 of that retainer had been earned. Nevertheless, all of it had been deposited into Fountain's operating account which, as of July 2005, had a negative balance. In another situation involving a car warranty case, a client gave Fountain a $3,000 retainer. Fountain told Mr. Herndon that $1,500 had been earned. In April 2005, the client requested his money back because his car had been fixed. Fountain sent the client a letter stating that the client was not entitled to any refund.

Mr. McCullough, the LFCP auditor, testified about his audit report. He explained that Fountain did not have any cash receipts or cash disbursement journals. Mr. McCullough was able to determine, however, that many retainers received by Fountain were deposited directly into Fountain's operating account, from which cash withdrawals were then made. Mr. McCullough cited illustrative examples. In one case, a $5,000 retainer check was deposited into Fountain's escrow account on March 31, 2005, followed by a cash withdrawal on April 1, 2005, of $5,000. In another case, a $1,000 retainer check was deposited into Fountain's operating account, from which $1,000 in cash was immediately withdrawn. Mr. McCullough also testified that 47 former clients of Fountain had filed claims with the LFCP, for a total of $268,000. Of these, 31 claims totaling $101,635 have been paid.

Ms. Thompson testified about the work that Fountain did for her in connection with the debt which her business owed to Center Capital. On July 15, 2004, Ms. Thompson gave Fountain two checks, one for $12,500 and one for $2,500. The $12,500 check was supposed to be used to make a $10,000 payment to a debtor, with the remaining $2,500 to be Fountain's fee. The second $2,500 check was a down payment toward a $5,000 retainer for Fountain representing Ms. Thompson's business

6. The Panel notes that, in his proposed Answer, Fountain admitted the allegations in paragraph 5 of the Petition, including the fact that Fountain told Mr. Herndon that he owed potentially $46,000 of unearned fees and other funds to his clients. Thus, if Fountain's request to vacate had been granted, the Answer that Fountain intended to file would have admitted that Fountain owed potentially $46,000 of unearned fees and other funds to over 20 clients.

and, in Fountain's words keeping "the wolves from the door." On July 16, 2004, Ms. Thompson received a call from Wachovia Bank, advising that Fountain was attempting to cash the $12,500 check. Ms. Thompson thought this was odd and called Fountain to ask why he had cashed the check. Fountain assured Ms. Thompson that he would put the money into his escrow account. Fountain subsequently cashed two smaller retainer checks that Ms. Thompson provided, one for $1,000 and one for $1,500.

As noted above, the $10,000 payment to the debtor was never made. Instead, Fountain told Ms. Thompson that he had negotiated that payment down to $7,000. The $3,000 difference was not refunded to Ms. Thompson. She was never provided any accounting for those funds, nor was she given a statement showing how, if at all, it was earned. Likewise, with respect to the $5,000 retainer that was supposed to be used to keep the "wolves" from her door, Ms. Thompson never received any accounting.

Ms. Thompson testified that Fountain did very little work. The new security agreement which she signed in December 2004 was never sent to Center Capital. Moreover, Fountain did not timely provide it to her. According to Ms. Thompson, the agreement that Fountain presented to her in December 2004 should have been given to her in November 2004, because it required her to make certain payments starting in December. Although $7,000 was eventually paid to Center Capital, Fountain did not make the payment until March 2005, and Ms. Thompson did not learn that until August 2005.

The last witness to testify was Marvin Davis, Jr. In early 2005, Mr. Davis retained Fountain to represent him in a criminal case. Mr. Davis and his ex-wife were charged with Medicaid fraud. Mr. Davis wanted to resolve the matter by reimbursing the State for the Medicaid payments. Fountain told Mr. Davis to make a check payable to Fountain in the amount of $10,531, which Fountain would pay to the State. Mr. Davis' check, which was dated March 3, 2005, was deposited into Fountain's operating account on March 4, 2005. Although Fountain was supposed to pay this money to the State on Mr. Davis' behalf, he did not do so. Mr. Davis did not know that Fountain had not paid the State. Mr. Davis was later arrested because the payment was not made, and as a result he was put on 18–month probation.

Mr. Davis also retained Fountain in connection with another matter and paid him a $4,000 retainer. Fountain later withdrew his representation and referred Mr. Davis to a Dover attorney. The $4,000 retainer was not refunded. Mr. Davis also loaned Fountain $2,000 which has not been repaid. According to Mr. Davis, Fountain owes him a total of $16,531.

### Disciplinary Violations Deemed Admitted [7]

The following violations of the Delaware Lawyers Rules of Professional Conduct ("Rules") have been deemed admitted by virtue of Fountain's failure to file a timely answer:

Board Case No. 30, 2005(ODC)—failure to safeguard client funds (Rule 1.15(a)); failure to promptly deliver funds to a third party (Rule 1.15(b)); knowingly making false statements (Rule 8.1(a)); engaging in criminal conduct (Rule 8.4(b)); conduct involving dishonesty (Rule 8.4(c)); conduct involving misrepresentation (Rule 8.4(c)); and engaging in conduct prejudicial to the administration of justice (Rule 8.4(d)).

---

7. These facts are taken almost verbatim from the Board's Report.

Board Case No. 1, 2006 (B. Thompson)—failure to act with diligence and promptness (Rule 1.3); charging an unreasonable fee (Rule 1.5(a)); failure to safeguard client funds (Rule 1.15(a)); failure to promptly deliver funds to a third party (Rule 1.15(b)); failure to protect client's interest upon termination of representation (Rule 1.16(d)); and engaging in dishonest conduct (Rule 8.4(c)).

Board Case No. 2, 2006 (V. Smack)—failure to provide a written contingency fee agreement (Rule 1.5(c)); failure to safeguard client property (Rule 1.15(a)); failure to promptly deliver funds to a third party (Rule 1.15(b)); failure to hold funds separate (Rule 1.15(c)); and engaging in dishonest conduct (Rule 8.4(c)).

Board Case No. 3, 2006 (M. Lacy)—failure to act with diligence and promptness (Rule 1.3); charging an unreasonable fee (Rule 1.5(a)); failure to safeguard client funds (Rule 1.15(a)); failure to protect client's interest upon termination of representation (Rule 1.16(d)); and engaging in dishonest conduct (Rule 8.4(c)).

### Board Recommends Disbarment

The ODC recommends that Fountain be disbarred citing various ABA standards, *In re Carey,*[8] *In re Greene,*[9] and *In re Maguire.*[10] Fountain argues that disbarment is too onerous and relies on *In re Hiner.*[11] The Board recommends disbarment under the facts and circumstances of this case.

 The Board's recommendation is helpful to the Court, but it is not binding.[12]

When determining an appropriate sanction for lawyer misconduct, this Court "looks to the ABA Standards for Imposing Lawyer Sanctions as a model for determining the appropriate discipline warranted under the circumstances of each case."[13] The ABA's four factors to consider include "(a) the ethical duty violated; (b) the lawyer's mental state; (c) the extent of the actual or potential injury caused by the lawyer's misconduct; and (d) aggravating and mitigating factors."[14] In reaching its recommendation, the Board carefully considered the ABA standards for imposing lawyer sanctions (the "ABA Standards") and the four-factor analysis considered under those standards, as follows:

#### A. Duties Violated by Fountain

The Board concluded that the ethical violations include duties to clients, the legal system and the profession.

#### B. Fountain's Mental State

The Board concluded that Fountain's mental state was knowing. Mr. Davis' testimony, which was unrebutted, illustrates Fountain's knowing state of mind. When Mr. Davis wanted to reimburse Medicaid funds to the State, Fountain told Mr. Davis to make the check payable to Fountain and that Fountain would tender payment on behalf of Mr. Davis. Fountain immediately deposited Mr. Davis' check into his own operating account and did not pay the State. The Board concluded that Fountain did not intend to use the check to reimburse the State, and that he took ad-

---

8. *In re Carey,* 809 A.2d 563 (Del.2002).

9. *In re Greene,* 701 A.2d 1061 (Del.1997).

10. *In re Maguire,* 725 A.2d 417 (Del.1999).

11. *In re Hiner,* 796 A.2d 654 (Del.Supr.2002) (ORDER) (*"Hiner I"*) and *In re Hiner,* 813 A.2d 1140 (Del.Supr.2002) (ORDER) (*"Hiner II"*).

12. *In re Froelich,* 838 A.2d 1117, 1120 (Del. 2003).

13. *In re Bailey,* 821 A.2d 851, 866 (Del.2003).

14. *Id.*

vantage of Mr. Davis, who was not financially sophisticated.

### C. Injury Caused by Fountain's Misconduct

The Board concluded that Fountain's clients, including Ms. Thompson, Ms. Smack, Mr. Lacy and Mr. Davis, were injured financially by Fountain's conduct.[15]

### D. Aggravating and Mitigating Circumstances

ABA Standard § 9.22 sets forth a list of aggravating factors, many of which exist here. Based on the deemed admissions and the evidence presented at the hearing, the Board found the following aggravating factors:

1. Fountain has a prior disciplinary record (ABA Standard § 9.22(a)). By Order dated July 11, 2005, the Delaware Supreme Court suspended Fountain from the practice of law for three years. The Board notes that many of the violations addressed in this Report occurred during the pendency of the disciplinary proceedings leading up to the 2005 suspension.

2. Fountain was dishonest and had a selfish motive (ABA Standard § 9.22(b)). For example, Fountain led Mr. Davis into believing that if Mr. Davis gave Fountain money to reimburse the State, Fountain would pay the money to the State. To the contrary, Fountain deposited Mr. Davis' check into his operating account. That operating account had a negative balance three months later when the Receiver took control of it. Fountain apparently used Mr. Davis' money for Fountain's personal expenses.

3. Fountain has engaged in a pattern of misconduct (ABA Standard § 9.22(c)).

4. Fountain's misconduct consists of multiple offenses (ABA Standard § 9.22(d)).

5. Fountain took advantage of vulnerable clients (ABA Standard § 9.22(h)) including, for example, Mr. Davis.

6. Fountain has substantial experience in the practice of law (ABA Standard § 9.22(i)). He was admitted to the Delaware Bar in 1984.

ABA Standard § 9.32 sets forth a variety of factors to be considered in mitigation. The Board found that the following mitigating factors exist:

1. Fountain appears to have personal and/or emotional problems including a potential gambling problem (ABA Standard § 9.32(c)). We use the word "appears" because Fountain did not offer any testimony. There was other evidence, however, that suggests Fountain has a gambling problem.

2. Fountain appears to have cooperated for the most part with the Receiver appointed for his practice (ABA Standard § 9.32(e)).

The Board concluded that the following ABA Standards point to disbarment as the appropriate sanction: Standard 4.11 (disbarment generally appropriate for knowing conversion of client property and causing injury or potential injury to a client); Standard 4.41(b) (disbarment generally appropriate when a lawyer knowingly fails to perform services for a client and causes serious or potentially serious injury to a client); Standard 5.11(b) (disbarment generally appropriate when a lawyer engages in intentional conduct involving dishonesty,

---

**15.** Fountain's counsel admitted financial injury to clients caused by Fountain's deposit of unearned fees directly into his operating account.

fraud, deceit or misrepresentation that seriously adversely reflects on the lawyer's fitness to practice); and Standard 7.1 (disbarment generally appropriate when a lawyer knowingly engages in conduct that violates a duty owed to the profession with intent to obtain a benefit for the lawyer and causes a serious or potentially serious injury to the client, public or legal system).

### *Disbarment Appropriate Sanction*

■ We agree with the Board's conclusions and its recommendation that Fountain be disbarred. Although we have not adopted a *per se* rule, this Court has consistently imposed the sanction of disbarment in situations where the conversion of clients' funds has been established.[16] In fact, in every prior Delaware disciplinary matter in which an attorney has intentionally misappropriated client funds, the attorney has been disbarred.[17]

In Fountain's case, we again conclude that any sanction other than disbarment would not provide the necessary protection for the public, serve as a deterrent to the legal profession, nor preserve the public's trust and confidence in the integrity of the Delaware lawyers' disciplinary process.

Now, therefore, it is ordered that Darryl K. Fountain be disbarred from membership in the Delaware Bar. His name shall be immediately stricken from the Roll of Attorneys entitled to practice before the courts of this State.

---

**16.** *In re Priestley,* 663 A.2d 488 (Del.1995); *In re Agostini,* 632 A.2d 80 (Del.1993); *In re Sullivan,* 530 A.2d 1115 (Del.1987); *In re England,* 421 A.2d 885 (Del.1980); *In re Clark,* 250 A.2d 505 (Del.1969).

**17.** *See, e.g., In re Garrett,* 909 A.2d 103 (Del. 2006); *In re Carey,* 809 A.2d 563 (Del.2002) (attorney disbarred for intentionally misappropriating client funds); *In re Benge,* 783 A.2d 1279 (Del.2001) (attorney disbarred for conduct including conversion of client property); *In re Maguire,* 725 A.2d 417 (Del.1999) (conduct warranting disbarment included misappropriation of client funds); *In re Greene,* 701 A.2d 1061 (Del.1997) (despite mitigating factors of inexperience in the practice of law, personal and emotional problems relating to drug addiction, eventual cooperation with the ODC, interim rehabilitation, imposition of other penalties or sanctions, and remorse, attorney disbarred for misappropria-

tion of client funds); *In re Dorsey,* 683 A.2d 1046 (Del.1996) (theft of client funds warranted disbarment); *In re Priestley,* 663 A.2d 488 (Del.1995) (attorney disbarred for intentionally and feloniously committing multiple acts of conversion of client funds); *In re Agostini,* 632 A.2d 80 (Del.1993) (attorney disbarred following felony conviction for theft of client funds); *In re Higgins,* 582 A.2d 929 (Del. 1990) (lawyer disbarred for felonious conversion of client funds held in trust); *In re Sullivan,* 530 A.2d 1115 (Del.1987) (disbarment appropriate sanction for commingling and misappropriating clients' funds); *In re England,* 421 A.2d 885 (Del.1980) (disbarment for misconduct including the illegal conversion of client funds for personal use); *In re Clark,* 250 A.2d 505 (Del.1969) (attorney disbarred for converting clients' funds for personal purposes); *In re Hawkins,* 87 A. 243 (Del.Super.1913) (attorney reinstated after disbarment for embezzlement).