IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | |
|---|---|
| IN THE MATTER OF A MEMBER OF THE BAR OF THE SUPREME COURT OF DELAWARE:<br><br>MATTHEW M. CARUCCI,<br><br>Respondent. | § No. 50, 2016<br>§<br>§ Board on Prof. Responsibility<br>§ Case Nos. 111716-B; 111746-B;<br>§ 111785-B; 112295-B; 112296-B;<br>§ 112311-B; 112313-B; 112314-B;<br>§ 112321-B; 112322-B; 112325-B<br>§ and 112326-B |

Submitted: February 3, 2016
Decided: February 8, 2016

Before **STRINE**, Chief Justice; **HOLLAND**, and **VALIHURA**, Justices.

## O R D E R

This 8th day of February 2016, it appears to the Court that:

(1)    This is a lawyer disciplinary proceeding.  On February 2, 2016, a panel of the Board on Professional Responsibility ("the Board") filed its Report with this Court, dated January 26, 2016, recommending that the respondent, Matthew M. Carucci, be suspended from the practice of law in Delaware for a period of 18 months, retroactive to the date of Carucci's transfer to disability inactive status on October 30, 2013.  Neither the Office of Disciplinary Counsel ("ODC") nor Carucci has filed any objections to the Board's report.

(2)    The Court has considered the matter carefully.  Carucci substantially admitted the ethical violations alleged in the ODC's petition

against him. The Board carefully considered Carucci's ethical violations, his knowing state of mind, the actual or potential injury caused by his misconduct, and all of the applicable aggravating and mitigating factors. Under the circumstances, we find the Board's recommendation of an 18-month suspension to be appropriate. We therefore accept the Board's findings and recommendation for discipline.

NOW, THEREFORE, IT IS ORDERED that the Board's Report dated January 26, 2016 (attached hereto) is ACCEPTED. Matthew Carucci is hereby SUSPENDED from the practice of law in Delaware for a period of 18 months beginning October 30, 2013. Carucci shall pay the cost of the disciplinary proceedings. The Office of Disciplinary Counsel shall disseminate this Order in accordance with Rule 14 of the Delaware Lawyers' Rules of Disciplinary Procedure.

BY THE COURT:

_Randy J Holland_
Justice

2

EFiled: Feb 02 2016 11:06AM EST
Filing ID 58507006
Case Number 50,2016

BOARD ON PROFESSIONAL RESPONSIBILITY OF THE
SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| In the Matter of | ) | |
| a Member of the Bar of | ) | CONFIDENTIAL |
| the Supreme Court of | ) | |
| the State of Delaware: | ) | Board Case Nos. 111716-B; 111746-B; |
| | ) | 111785-B; 112295-B; 112296-B; |
| | ) | 112311-B; 112313-B; 112314-B; |
| MATTHEW M. CARUCCI | ) | 112321-B; 112322-B; 112325-B; |
| Respondent. | ) | and 112326-B |

## REPORT OF THE BOARD ON
## PETITION FOR DISCIPLINE AND RECOMMENDED SANCTIONS

The Petition for Discipline in this matter was filed on October 8, 2015 (the "Petition") by the Office of Disciplinary Counsel ("ODC"). The ODC seeks sanctions against Matthew M. Carucci ("Carucci" or "Respondent") for (i) violating the rules governing ethical conduct of a lawyer who does not meet his obligations to eleven (11) different clients, (ii) for making a misrepresentation to the Court and (iii) for not properly safeguarding funds of certain clients. A hearing was held on November 19, 2015, in the Supreme Court Hearing Room, 11th Floor, Carvel State Building, 820 North French Street, Wilmington, Delaware ("the Hearing"). The members of the panel for the Board were Mr. Dennis Klima, John L. Reed, Esquire and Wayne J. Carey, Esquire who acted as Chair (the "Panel"). Kathleen M. Vavala, Esquire represented the ODC, and Mr. Charles Slanina, Esquire represented the Respondent.

## ADMITTED FACTS[1]

The facts as alleged in the Petition are substantially admitted. For the sake of ease, we quote verbatim from the Petition and the Answer filed October 27, 2015.

---

1 References to the hearing transcript are cited as "Tr.__". References to the Petition and/or Answer are either just quoted with paragraph number reference of citing as "Petition § __" or "Answer §__. Thanks to Mr. Slanina for provided his interlineated Answer electronically.

"1.     Respondent was admitted to the Bar of the Supreme Court of Delaware in 2004."

"ANSWER:   Admitted." [2]

Respondent is also admitted in Pennsylvania.[3]

"2.     At all times relevant to this Petition, Respondent was engaged in the private practice of law with primary responsibility for the books and record keeping of his firm, Carucci DiLorenzo, LLC ('Carucci DiLorenzo')."

"ANSWER:   Admitted". The Carucci DiLorenzo partnership ended on December 30, 2012.[4]

"3.     On October 23, 2013 the Delaware Supreme Court transferred Respondent to disability inactive status and stayed all disciplinary proceedings against him." The application for disability inactive status was actually filed by Carucci himself, who recognized the problems he was having and that he needed help.[5]

"ANSWER:   Admitted. "

"4.     The Chancery Court appointed Andrew D. Rahaim, Esquire as Receiver of the Respondent's law practice on October 30, 2013. On November 7, 2013, Mr. Rahaim assumed control over Respondent's Attorney Trust Account and Attorney Operating Account.  The balance in Respondent's Attorney Trust Account was $2.50; the balance in his Attorney Operating Account was negative $381.73."

"ANSWER:   As soon as he was notified by the Receiver of the negative operating account balance, Respondent deposited sufficient funds to eliminate the negative balance."

2 Tr. 14.
3 Tr. 61.
4 Tr. 15.
5 Tr. 76.

"5.    On November 7, 2014, the Court lifted the stay on Respondent's disciplinary proceedings, but continued him on disability inactive status."

"ANSWER:   Admitted."

There are eleven separate client matters which are the subject of this proceeding whereby Carucci is accused of having neglected his duties as those clients' lawyer.

"MICHAEL AND ELIZABETH APOSTOLICO"

"6.    In 2011 or 2012, Michael and Elizabeth Apostolico ('Apostolicos') retained Carucci DiLorenzo to prepare and file a bankruptcy petition and represent them in post-filing matters, including the 341 Meeting of the Creditors."

"ANSWER:   Admitted."

"7.    The Apostolicos paid Carucci DiLorenzo an advance fee of at least $981, which included the court filing fee and costs."

"ANSWER:   Admitted that the Apostolicos paid Carucci DiLorenzo a fee of at least $981 which included the court filing fees and costs.[6]   Respondent maintains that most, if not all, of that fee was earned when paid."

"8.    Respondent never filed a bankruptcy petition for the Apostolicos and did not attend the 341 Meeting of the Creditors."

"ANSWER:   Admitted."

The Apostolicos matter was taken over by Mr. Mark Billion who represented the Apostolicos without charge.[7]

"JACQUELINE CROTHERS"

"9.    In 2011 or 2012, Jacqueline Crothers ('Crothers') retained Carucci

---

[6] Tr. 18
[7] Tr, 18. The panel notes that Mr. Billion generously took over several other bankruptcy cases without charge to the clients of Mr. Carucci. His generosity deserves some form of recognition from the Court.

3

DiLorenzo to prepare and file a bankruptcy petition and represent her in post-filing matters, including the 341 Meeting of the Creditors."

"ANSWER: Admitted."

"10. Crothers paid Carucci DiLorenzo an advance fee of at least $1306, which included the court filing fee and costs."

"ANSWER: Admitted that the Crothers paid Carucci DiLorenzo a fee of at least $1,306 which included the court filing fees and costs. Respondent maintains that most, if not all, of that fee was earned when paid."

"11. Respondent never filed a bankruptcy petition for Crothers and did not attend the 341 Meeting of the Creditors."

"ANSWER: Admitted."

Respondent refunded Ms. Crothers the full fee she had paid. The source of the funds for that refund was an account in the name of Respondent's wife, Lisa Ramirez, but was actually a joint account Respondent held with his wife.[8] Respondent's standard fee in Chapter 7 bankruptcy cases was $1306, $1000 for his fee and $306 for the filing fee with the Bankruptcy Court.[9]

"RONALD GROOMS "

"12. In 2012 or 2013, Ronald Grooms ('Grooms') retained Carucci DiLorenzo to prepare and file an Inventory and Accounting in connection with the estate of his late wife."

"ANSWER: Admitted."

---

8 Tr. 20.
9 Tr. 21

4

"13.    Grooms paid Carucci DiLorenzo an advance fee of $500."

"ANSWER:   Admitted that Ronald Grooms paid Carucci DiLorenzo a fee of at least $500 which included the court filing fees and costs.  Respondent maintains that most, if not all, of that fee was earned when paid."

"14.    Respondent never filed the Inventory or Accounting for Grooms."

"ANSWER:   Admitted."

To date Respondent has not refunded the fee to Grooms.[10]

"ROMAYNE SEWARD "

"15.    In 2012, Romayne Seward ('Seward') retained Carucci DiLorenzo to complete a Will, Testamentary Trust, Living Will and Power of Attorney ('Estate Planning Documents')."

"ANSWER:   Admitted."

"16.    Seward paid Carucci DiLorenzo an advance fee of $550."

"ANSWER:   Admitted that Romayne Seward paid Carucci DiLorenzo a fee of at least $550 which included the court filing fees and costs.  Respondent maintains that most, if not all, of that fee was earned when paid."

"17.    Respondent did not complete the Estate Planning Documents for Seward."

"ANSWER:   Admitted."

Respondent testified that they had gotten some drafting work done on the Estate Planning Documents, but those documents were never executed.[11]   Nevertheless,

---

10 Tr. 22.
11 Tr. 23

Respondent refunded the fees paid by Seward, but not from a client trust account.[12]

"BRIDGET HUBER"

"18. In 2012, Bridget Huber ('Huber') retained Carucci DiLorenzo to prepare and file a bankruptcy petition and represent her in post-filing matters, including the 341 Meeting of the Creditors."

"ANSWER: Admitted."

"19. Huber paid Carucci DiLorenzo an advance fee of $1306, which included the court filing fee and costs."

"ANSWER: Admitted that Bridget Huber paid Carucci DiLorenzo a fee of at least $1,306 which included the court filing fees and costs. Respondent maintains that most, if not all, of that fee was earned when paid."

"20. Respondent never filed a bankruptcy petition for Huber and did not attend the 341 Meeting of the Creditors."

"ANSWER: Admitted."

Ms. Huber's bankruptcy petition was filed by Mr. Billion who agreed to take the matter on without charge to Ms. Huber.[13] Fees paid by Ms. Huber to Respondent were never refunded.[14]

"JOYCE THOMPSON"

"21. In 2012 or 2013, Joyce Thompson ('Thompson') retained Carucci DiLorenzo to prepare and file a bankruptcy petition and represent her in post-filing matters, including the 341 Meeting of the Creditors."

"ANSWER: Admitted."

---

12 Tr. 24.
13 Tr. 28.
14 Tr. 28.

6

"22. Thompson paid Carucci DiLorenzo an advance fee of at least $1306, which included the court filing fee and costs."

"ANSWER: Admitted that Joyce Thompson paid Carucci DiLorenzo a fee of at least $1,306 which included the court filing fees and costs. Respondent maintains that most, if not all, of that fee was earned when paid."

"23. Respondent never filed a bankruptcy petition for Thompson and did not attend the 341 Meeting of the Creditors."

"ANSWER: Admitted."

Again, Mr. Billion stepped up and took over Ms. Thompson's case, filing the bankruptcy petition without charge to Ms. Thompson.[15] Respondent never refunded any of the fee to Ms. Thompson.[16]

## "LAURIE PETERSON AND CRYSTAL RODRIGUEZ"

"24. In 2013, Laurie Peterson and Crystal Rodriguez ('Peterson and Rodriguez') retained Carucci DiLorenzo to prepare and file a Petition for Adoption and to Terminate Parental Rights ('Adoption Petition')."

"ANSWER: Admitted. "

Peterson and Rodriquez are a same sex couple who conceived with a sperm donor. One partner wanted to adopt the birth mother's child and terminate the parental rights of the sperm donor.[17]

"25. Peterson and Rodriguez paid Carucci DiLorenzo an advance fee of at least $1285, which included the court filing fee and costs."

"ANSWER: Admitted that Peterson and Rodriguez paid Carucci DiLorenzo a

---

15 Tr. 29
16 Tr. 30.
17 Tr. 31

7

fee of at least $1,285 which included the court filing fees and costs. Respondent maintains that most, if not all, of that fee was earned when paid."

"26. Respondent never filed the Adoption Petition for Peterson and Rodriguez."

"ANSWER: Admitted."

However, Respondent did refund $1000 to Peterson and Rodriguez. The refund was paid by Robert Carucci, Respondent's father, as a loan to his son.[18]

"DEBRA CARBONE"

"27. In 2013, Debra Carbone ('Carbone') retained Carucci DiLorenzo to prepare and file a bankruptcy petition and represent her in post-filing matters, including the 341 Meeting of the Creditors."

"ANSWER: Admitted."

"28. Carbone paid Carucci DiLorenzo $950, which included the court filing fee and costs."

"ANSWER: Admitted that Carbone paid Carucci DiLorenzo $950. Respondent is without sufficient information or belief to admit or deny that the fee included the court filing fee and other costs. Respondent maintains that most, if not all, of that fee was earned when paid."

"29. Respondent never filed a bankruptcy petition for Carbone and did not attend the 341 Meeting of the Creditors."

"ANSWER: Admitted."

Respondent provided a refund to Ms. Carbone using a check from Carucci's personal account.[19]

---

18 Tr. 31-32.
19 Tr. 33.

<u>"WILLIAM STEWART "</u>

"30.    In 2013, William Stewart ('Stewart') retained Carucci DiLorenzo to prepare and file a bankruptcy petition and represent him in post-filing matters, including the 341 Meeting of the Creditors."

"ANSWER:   Admitted."

"31.    Stewart paid Carucci DiLorenzo an advance fee of $1306, which included the court filing fee and costs."

"ANSWER:   Admitted that Stewart paid Carucci DiLorenzo a fee of at least $1,306 which included the court filing fees and costs.  Respondent maintains that most, if not all, of that fee was earned when paid."

"32.    Respondent never filed a bankruptcy petition for Stewart and did not attend the 341 Meeting of the Creditors."

"ANSWER:   Admitted."

Yet again, the petition was filed by Mr. Billion, without charging any fee to Mr. Stewart.  No refund has been made to Mr. Stewart by Respondent.[20]

<u>"ROXANNE CARTER"</u>

"33.    In 2013 Roxanne Carter ('Carter') retained Carucci DiLorenzo to prepare and file a bankruptcy petition and represent her in post-filing matters, including the 341 Meeting of the Creditors."

"ANSWER:   Admitted."

"34.    Carter paid Carucci DiLorenzo an advance fee of $1306, which included the court filing fee and costs."

"ANSWER:   Admitted that Carter paid Carucci DiLorenzo a fee of at least

---

[20] Tr. 34.

9

$1,306 which included the court filing fees and costs. Respondent maintains that most, if not all, of that fee was earned when paid."

"35.     Respondent never filed a bankruptcy petition for Carter and did not attend the 341 Meeting of the Creditors."

"ANSWER:   Admitted."

Respondent did have Ms. Carter sign an engagement agreement which indicated that the attorney client relationship began when the agreement was signed which took place on September 2, 2013. The petition was filed by Mr. Billion again without charge to the client. The retainer of $1306 paid by Ms. Carter was deposited into Respondent's firm's operating account on August 27, 2013 before the engagement letter was signed and before the attorney client relationship officially began as provided in the engagement letter.[21] No refund of the retainer has ever been made to Ms. Carter.[22]

"JENNIFER RINEHOLT"

"36.     In 2013, Jennifer Rineholt ('Rineholt') retained Carucci DiLorenzo to prepare and file a divorce petition."

"ANSWER:   Admitted."

"37.     Rineholt paid Carucci DiLorenzo an advance fee of $910, which included the court filing fee and costs."

"ANSWER:   Admitted that Rineholt paid Carucci DiLorenzo a fee of at least $910 which included the court filing fees and costs. Respondent maintains that most, if

---

21 Tr. 35-37.
22 Tr. 38.

not all, of that fee was earned when paid."

"38.    Respondent never filed a divorce petition for Rineholt."

"ANSWER:   Admitted."

Respondent returned the retainer to Ms. Rineholt.  The source of that check was not the client trust account.  That refund was made following an investigation by the Lawyers' Fund for Client Protection.[23]

The Petition alleges the following counts against the Respondent, who answers as indicated:

"COUNT I:          RESPONDENT FAILED TO PROVIDE COMPETENT
                   REPRESENTATION IN VIOLATION OF RULE 1.1"

"39.    Rule 1.1 states an attorney "shall provide competent representation to a client.  Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation."

"ANSWER:   No answer required."

"40.    By failing to file the Inventory and Accounting for Grooms, failing to complete the Estate Planning Documents for Seward, failing to file the Adoption Petition for Peterson and Rodriguez, failing to file the divorce petition for Rineholt, and failing to prepare and/or file bankruptcy petitions for the Apostolicos, Crothers, Huber, Thompson, Carbone, Stewart and Carter, Respondent failed to provide competent representation in violation of Rule 1.1."

"ANSWER:   Admitted.  By way of further answer, Respondent asserts that at the time he failed to provide competent representation, he was suffering from a serious medical disability."

---

23 Tr. 38.

"COUNT II:        RESPONDENT FAILED TO ACT WITH REASONABLE
                 DILIGENCE IN VIOLATION OF RULE 1.3"

"41.   Rule 1.3 states an attorney "shall act with reasonable diligence and promptness in representing a client."

"ANSWER:   No answer required."

"42.   By failing to file the Inventory and Accounting for Grooms, failing to complete the Estate Planning Documents for Seward, failing to file the Adoption Petition for Peterson and Rodriguez, failing to file the divorce petition for Rineholt, and failing to prepare and/or file bankruptcy petitions for the Apostolicos, Crothers, Huber, Thompson, Carbone, Stewart and Carter, Respondent failed to act with reasonable diligence in violation of Rule 1.3."

"ANSWER:   Admitted.  By way of further answer, Respondent asserts that at the time he failed to provide diligent representation, he was suffering from personal and emotional issues as well as a serious medical disability."

"COUNT III:       RESPONDENT FAILED TO RETAIN UNEARNED ADVANCE
                 FEES IN A TRUST ACCOUNT IN VIOLATION OF RULE 1.5(f)"

"43.   Rule 1.5(f) states an attorney "may require the client to pay some or all of the fee in advance of" the representation provided "[a]ll unearned fees shall be retained in the lawyer's trust account ...""

"ANSWER:   Admitted.   By way of further answer, Comment [10] to Rule 1.5 states as follows: "Some smaller fees – such as those less than $2,500 – may be considered earned in whole upon some identified event, such as upon commencement of the attorney's work on that matter or the attorney's appearance on the record. However, a fee considered to be 'earned upon commencement of the attorney's work

12

on the matter' is not the same as a fee 'earned upon receipt.' The former requires that the attorney actually begin work whereas the latter is dependent only upon payment by the client. In a criminal defense matter, for example, a smaller fee – such as a fee under $2,500 – may be considered earned upon entry of the attorney's appearance on the record or at the initial consultation at which substantive, confidential information has been communicated which would preclude the attorney from representation of another potential client (e.g. a co-defendant). Nevertheless, all fees must be reasonable such that even a smaller fee might be refundable, in whole or in part, if it is not reasonable under the circumstances."

"44. By failing to retain all unearned advance fees in the attorney trust account for the Grooms, Seward, Peterson and Rodriguez, Rineholt, Apostolico, Crothers, Huber, Thompson, Carbone, Stewart and Carter matters, Respondent violated Rule 1.5(f)."

"ANSWER: Admitted. By way of further answer, Respondent asserts that at the time he failed to retain all unearned fees in a trust account, he was suffering from personal and emotional issues as well as a serious medical disability. Respondent further asserts that he has refunded all unearned fees when requested and that most if not all of the fee was earned when paid."

"COUNT IV:     RESPONDENT FAILED TO SAFEGUARD CLIENT FUNDS
              IN VIOLATION OF RULE 1.15(a)"

"45. Rule 1.15(a) states an attorney shall safeguard property of clients or third persons in his possession."

"ANSWER: No answer required."

13

"46. By failing to maintain advance fees in the attorney trust account in the Grooms, Seward, Peterson and Rodriguez, Rineholt, Apostolico, Crothers, Huber, Thompson, Carbone, Stewart and Carter matters, Respondent failed to safeguard client funds in violation of Rule 1.15(a)."

"ANSWER: Admitted. By way of further answer, Respondent asserts that at the time he failed to safeguard client funds, he was suffering from personal and emotional issues as well as a serious medical disability. Respondent further asserts that he has refunded all unearned fees when requested and that most if not all of the fee was earned when paid."

"LFCP AUDIT"

"47. On October 21, 2013, Master Sidlow Associates, P.A., auditor for the Lawyers' Fund for Client Protection ("LFCP"), attempted to conduct a compliance audit of Respondent's law practice's books and records for the twelve month period ending September 30, 2013. Respondent was asked to provide documentation necessary for completion of the audit and could not do so. The audit was suspended when Respondent unexpectedly left the office. On December 18, 2013, the LFCP resumed the audit and prepared a report regarding its findings."

"ANSWER: Admitted that on October 21, 2013, Master Sidlow Associates, P.A., auditor for the Lawyers' Fund for Client Protection ("LFCP"), began a compliance audit of Respondent's law practice's books and records for the twelve month period ending September 30, 2013. Admitted that Respondent was asked to provide documentation necessary for completion of the audit and could not immediately do so. Denied that the audit was suspended when Respondent unexpectedly left the office."

14

"By way of further answer, the auditors advised Respondent that they were leaving to get lunch. When they had not returned approximately two hours later, Respondent left to pick up his children from school. When he returned from doing so, one of the auditors was meeting with Respondent's father, who is a CPA. When Respondent asked the auditor if anything else was required of Respondent, he was told that they did not need anything from him at that time and Respondent left. Subsequently, the LFCP auditors requested additional information from Respondent. Respondent provided that information to the Receiver. The Receiver was then advised by the LFCP auditors that the information was no longer needed."

"48. The audit revealed the following deficiencies in Respondent's books and records:"

"a. Respondent's cash receipts entries did not match deposit totals in any of the months in the time period reviewed;"

"b. Respondent did not identify the client name in the cash disbursements journal entries;"

"c. Respondent did not prepare proper bank reconciliations so it could not be determined whether there were any outstanding checks;"

"d. The existence of a separate account for each client could not be determined due to the lack of complete client subsidiary ledgers;"

"e. The auditor could not ascertain that all fiduciary transactions for cash receipts and cash disbursements were entered in the subsidiary ledger;"

"f. Respondent's reconciled end of the month cash balances did not agree to total client funds held in any of the months during the time period

reviewed; and"

"g.    There were numerous instances of negative client funds in the time period reviewed."

"ANSWER:  Admitted.  By way of further answer, these deficiencies were noted for the audited period of September 30, 2012, to September 30, 2013. Respondent suffered personal and emotional problems during the period in question and was also suffering from a serious medical disability."

"49.    The 2013 Certificate of Compliance accompanying Respondent's Annual Registration Statement and filed with the Supreme Court includes misrepresentations regarding the status of Respondent's law practice's books and records.  Respondent answered "YES" to questions 2.3, 2.5, 2.6, 27, 2.8, 2.9, 2.10, 2.11, and 2.15 when he should have answered "NO.""

"ANSWER:  Admitted.  By way of further answer, Respondent's 2013 Certificate inaccurately reported the status of his books and records for the three months of 2012 covered by the LFCP audit.  Respondent did not file a Certificate of Compliance in 2014 or make any other representations as to the status of his books and records in 2013."

"COUNT V:        RESPONDENT FAILED TO MAINTAIN HIS LAW
                PRACTICE'S BOOKS AND RECORDS IN VIOLATION OF
                RULE 1.15(d)"

"50.    Rule 1.15(d) sets forth detailed and specific requirements for the maintenance of a law practice's books and records and handling of practice-related funds."

"ANSWER:  No answer required."

"51.    By failing to abide by the requirements for maintaining his law practice's books and records, Respondent violated Rule 1.15(d)."

"ANSWER:    Admitted"

"COUNT VI:  RESPONDENT ENGAGED IN CONDUCT INVOLVING MISREPRESENTATION IN VIOLATION OF RULE 8.4(c)"

"52.    Rule 8.4(c) states it is professional misconduct for an attorney to "engage in conduct involving ... misrepresentation.""

"ANSWER:    No answer required."

"53.    By filing his 2013 Certificate of Compliance with the Supreme Court, which included misrepresentations relating to Respondent's maintenance of his law practice's books and records, Respondent engaged in conduct involving misrepresentation in violation of Rule 8.4(c)."

"ANSWER:    Admitted.  By way of further answer, Respondent's 2013 Certificate of Compliance inaccurately reflected the status of his books and records for the three months of 2012 covered by the LFCP audit. Respondent did not file a Certificate of Compliance in 2014 or make any other representations as to the status of his books and records in 2013. "

"COUNT VII: RESPONDENT ENGAGED IN CONDUCT PREJUDICIAL TO THE ADMINISTRATION OF JUSTICE IN VIOLATION OF RULE 8.4(d)"

"54.    Rule 8.4(d) states it is professional misconduct for an attorney to "engage in conduct that is prejudicial to the administration of justice."

"ANSWER:    No answer required."

"55.    The Supreme Court relies on attorney representations in Certificates of Compliance in the administration of justice in connection with the practice of law in Delaware. "

"ANSWER:   No answer required."

"56.    By filing his 2013 Certificate of Compliance with the Supreme Court, which included misrepresentations relating to Respondent's maintenance of his law practice's books and records, Respondent engaged in conduct prejudicial to the administration of justice in violation of Rule 8.4(d)."

"ANSWER:   Admitted."

<u>Respondent's Explanation</u>

Respondent attributes his problems to mental health issues with his wife. Respondent and his wife were married in November of 2011.  Mrs. Carucci suffered from a major depressive disorder and PTSD from childhood abuse.[24]  On December 6, 2011, she suffered a break whereby she became verbally and physically abusive to Respondent and verbally abusive to Respondent's oldest son from his first marriage.[25] According to Respondent, his wife's abusive conduct included,

breaking things, throwing things, hitting me, attacking me, threatening me.  And it just sort of went from zero to 60 after this one event in that December.  And everything fell apart.[26]

Respondent continued, "By February, I was having panic attacks and just – I had never been through this before.  I had always thought I suffered from depression and I thought that was what was being triggered.  So I went and sought treatment."

I started seeing a therapist at some point in early '12, doctors for prescription. They started prescribing antidepressants.  Things got worse and worse between me and her.  Just added onto her mental health issue, a miscarriage in – it was right around Christmas or before Christmas of '11, maybe beginning of '12.  And just things getting

24 Tr. 63.
25 Tr. 63.
26 Tr. 63-64.

18

worse and worse between us. Her behavior and her inability to function becoming worse and worse and making my mental health issues going like this and just making each other worse and worse.[27]

We separated in April of '12. You would think maybe that would have solved some of it but it didn't.[28]

\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Things actually got worse between us from there over the next several months. She would show up a lot and the same sort of violent outbursts would happen. A lot of phone harassment, a lot of harassing other people I know, friends. She lashed out at my law partner, who was a close friend who was in our wedding and other people I was friends with. My parents. Just sort of scorched, earth, I'm going to ruin everything for this man mentally.[29]

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Mine was getting worse. My, like I said, what I thought was depressive disorder. More and more medications over 2012. Every time I would change doctors and they would change to a different antidepressant or add more to it. Hey, it's not working, let's try a little more.[30]

And everything just kept getting – no matter what I tried, everything just kept getting worse. The panic attacks got more frequent and more severe. Physical illness. Just inability to even get out of bed sometimes.[31]

According to Respondent's testimony, the anti-depressants were not helping. Instead, they seemed to make his condition worse. This worsening condition created an inability to function, adversely affected his memory, his appetite and his energy, "Even the clarity of my thinking."[32]

The depression had a serious effect on Respondent's ability to conduct his law practice. He tried to rely on attorneys in his firm to pick up the work load. However, it proved too difficult for those attorneys to maintain both their own workload and Respondent's.[33] As a result, Respondent became a solo practitioner by the end of 2012.

27 Tr. 64.
28 Tr. 64-65.
29 Tr. 66.
30 Tr. 66.
31 Tr. 66.
32 Tr. 67, 69
33 Tr. 68.

After more time with a variety of doctors, Respondent met Dr. K who, after evaluation, diagnosed Respondent not as depressive, but bi-polar, specifically Bipolar 2. His condition was exacerbated by the depression medicine he was given.[34] Dr. K eventually got him on the right medication for his condition. Respondent used a letter from Dr. K in support of his petition for disability.[35] That petition was filed on October 23, 2013.[36] The Order granting the petition for disability was entered on October 30, 2013.[37]

When he went on disability, in addition to the bankruptcy cases that Mr. Billion took over without charge to the clients[38], Mr. Rahaim took over as receiver of Respondent's practice.

Respondent readily admits that he should never have allowed the inattention to his practice to go on as long as it did.[39] He realizes that he put his clients through unnecessary difficulties. He openly admits his remorse for his culpability.[40]

The stay on disciplinary proceedings imposed by the Order granting disability was lifted upon application of Respondent on November 7, 2014.[41]


## PANEL'S FINDINGS

Respondent relies on Comment 10 to Rule 1.5 arguing that fees under $2500 need not be deposited in trust accounts. Respondent cannot dodge the bullet of guilt by such an argument. Respondent's reliance on this argument obviously has no merit.

---

34 Tr. 70-71.
35 Tr. 71.
36 Tr. 76.
37 Tr. 80.
38 Tr. 82.
39 Tr. 74
40 Tr. 75.
41 Tr. 84, 87.

The Delaware Supreme Court dealt with this very issue in In the Matter of Barakat,[42] where it held that the Comments to Rule 1.5 do not give blanket authorization to put all fees under $2500 in an operating account, bypassing the trust account. In the words of the Court, "By their plain language, the Comments do not authorize an attorney to deposit any fee under $2500 automatically into his operating account....By the Comments' own terms, if an attorney receives an advance fee of less than $2500.00, of which he owns a portion upon commencing work, *the unearned portion of the advance fee must still be placed in a fiduciary account.*"[43]

Except for the reliance on that misinterpretation of Comment 10 Rule 1.5, each of the counts is admitted. We, therefore, find that the ODC has met its burden of showing by clear and convincing evidence that each of the seven (7) counts was violated as alleged.[44]

## VI.    SANCTIONS

### A.    Objectives and Standards for Imposing Sanctions

"The objectives of the lawyer disciplinary system are to protect the public, to protect the administration of justice, to preserve confidence in the legal profession, and to deter other lawyers from similar misconduct."[45] It is the duty of the Board to recommend a sanction that will promote those objectives, while remembering the Supreme Court's admonishment that sanctions are not to be punitive or penal.[46]

In determining the appropriate sanction for lawyer misconduct, the Delaware Supreme Court follows the ABA Standards:

---

42 99 A.3d 639 (Del. 2013).
43 Id.(emphasis in original).
44 In re. Nowak, 5 A.3d 631 (Del. 2010).
45 In re McCann, 894 A.2d at 1088; In re Fountain, 878 A.2d 1167, 1173 (Del. 2005) (quoting In Re Bailey, 821 A.2d at 866); In re Doughty, 832 A.2d 724, 735-736 (Del. 2003).
46 In re Katz, 981 A.2d 1133, 1149 (Del. 2009); In re Garrett, 835 A. 2d 514, 515 (Del. 2003).

The ABA framework consists of four key factors to be considered by the Court: (a) the ethical duty violated; (b) the lawyer's mental state; (c) the actual or potential injury caused by the lawyer's misconduct; and, (d) aggravating and mitigating factors.[47]

### 1. The Ethical Duties Violated

Based on his own admissions and the corresponding findings of the Panel, the ethical duties violated can be summarized in the chart below:

| Count | Rule Violated | Content of Rule | Factual Basis for Violation | Resolutions |
|---|---|---|---|---|
| I | 1.1 | An attorney shall provide competent representation which requires legal knowledge, skill, thoroughness and preparation | (i) Failure to file Inventory and Accounting for Grooms, (ii) failing to complete estate planning documents for Seward, (iii) failing to file adoption petition for Peterson and Rodriquez, (iv) and failing to prepare and file bankruptcy petitions for Apostolicos, Crothers, Huber, Thompson, Carbone, Stewart and Carter | Admitted, qualified by statement of suffering a serious illness |
| II | 1.3 | An attorney shall act with reasonable diligence and promptness | (i) Failure to file Inventory and Accounting for Grooms, (ii) failing to complete estate planning documents for | Admitted qualified by statement of suffering a serious illness and personal |

---

47 *In re Doughty*, 832 A.2d at 736; *In re Goldstein*, 990 A.2d 404, 408 (Del. 2010); *See also In Re McCann*, 894 A.2d at 1088; *In re Fountain*, 878 A. 2d at 1173; *In re Steiner*, 817 A.2d at 793, 796 (Del. 2003).

| | | | Seward, (iii) failing to file adoption petition for Peterson and Rodriquez, (iv) and failing to prepare and file bankruptcy petitions for Apostolicos, Crothers, Huber, Thompson, Carbone, Stewart and Carter | and emotional issues |
|---|---|---|---|---|
| IV | 1.15(a) | An attorney shall safeguard property of clients or third persons in his possession | Failing to maintain advance fees in trust account in Grooms, Seward, Peterson and Rodriguez, Rineholt, Apostolico, Crothers, Huber, Thompson, Carbone, Stewart and Carter matters | Admitted qualified by statement of suffering a serious illness and personal and emotional issues; Also qualified by saying all unearned fees were returned when requested and that most if not all of the fee was earned when paid. |
| V LFCP Audit | 1.15(d) | Attorney must maintain proper books and records | In adequacies enumerated in paragraph 48 of petition. | Admitted |
| VI | 8.4(c) | Attorney must not engage in conduct involving... misrepresentation | Included misrepresentations in 2013 Certificate of Compliance | Admitted that 2013 Certificate inaccurately reflected |

23

| | | | | status of books and records |
|---|---|---|---|---|
| VII | 8.4(d) | Attorney shall not engage in conduct prejudicial to the administration of justice | Misrepresentations in 2013 Certificate of Compliance violated this rule | Admitted |

## 2.    The Lawyer's Mental State

Respondent bases his entire defense on the problems with his marriage and his resulting mental state, ultimately diagnosed as bipolar disorder. We view these matters to be relevant to mitigation, which we understand is what Carucci intends.

## 3.    Actual or Potential Injury

The Panel finds that there is limited, if any, actual harm to any of Respondent's clients. Restitution in the form of refunds of retainers has been made to those clients who requested it. Indeed, the record reflects unrebutted testimony from Respondent that some of the refunds were paid out of the personal account he held with his wife and other refunds were paid from money borrowed from Respondent's father since Carucci was not working and did not have income from which to finance refunds of client retainers.[48]. Those refunds were paid in full regardless of whether or not some work had been actually done to earn some of the fees.

Some retainers were earned in whole or in part. For example, Respondent testified, that, particularly in personal bankruptcy petitions, he would get much of the petition preparation work done with the client during the client's first visit to his office at the time retainers were paid.[49]

We do recognize at least the potential for, or even likelihood of, damage to

[48] Tr. 44.
[49] Tr. 46.

24

clients in the form of stress caused by the delay in Respondent taking action on the clients' matters. ODC argues for findings of potential harm, but again, there is nothing in the record from which we can conclude the existence of potential harm to clients.[50] Either through the work of Mr. Billion taking over bankruptcy cases at no charge and Mr. Rahaim, the receiver, the client matters were covered so that no client lost their legal rights.[51]

Again, we feel obliged to mention the role of Mr. Billion. As noted by ODC, without his stepping in at no charge to clients, injury could have been real and serious

## Aggravating and Mitigating Circumstances

After misconduct has been established, aggravating and mitigating circumstances may be considered in deciding what sanctions to impose.[52] "Aggravation or aggravating circumstances are any consideration of factors that may justify an increase in the degree of discipline to be imposed."[53]

### a) Aggregating Factors

The Panel finds the there are three aggravating factors as set forth in ABA Standard 9.22: (1) a pattern of misconduct based on the number of clients affected,[54] (2) multiple offenses again based on the number of clients affected[55]; and (3) substantial experience in the practice of law.[56] Mr. Carucci was admitted to the Delaware Bar over ten (10) years ago in 2004.[57]

### b) Mitigating Factors

---

50 Tr. 97-99; but see ABA Standard 1.3, Comment 3 referenced by ODC at Tr. 99.
51 Tr. 100.
52 *In re Bailey,* 821 A.2d 851 (Del. 2003), *Goldstein,* 990 A, 2d at 408.
53 ABA Standard 9.21.
54 ABA Standard 9.22 (c).
55 ABA Standard 9.22 (d).
56 ABA Standard 9.22(i).
57 Tr. 14.

Mitigating factors "are any considerations or factors that may justify a reduction in the degree of discipline to be imposed."[58] We find that the mitigating factors are as follows:

(1) absence of prior disciplinary record.[59] The ODC concedes that Mr. Carucci has not been disciplined before this case[60]; (2) absence of dishonest or selfish motive;[61] The existence of this factor is self-evident by Carucci's returning retainers using his own personal funds and his borrowing money from his father to pay some of those refunds. In addition he sought and obtained the generous help of Mr. Billion with respect to bankruptcy matters; (3) personal or emotional problems.[62] Carucci testified about his emotional problems leading to a bipolar diagnosis brought on by marital problems resulting from his wife's own emotional issues and the abuse to which he was subjected at his wife's hands; (4) effort to make restitution or rectify consequence of misconduct.[63] This factor is evidenced by his use of personal funds and borrowed funds to reimburse clients their retainers. We believe that this factor is also supported by Respondent's voluntary filing of the Petition for Disability.[64] (5) By all indication, Carucci was professional and cooperative throughout these proceedings;[65] (6) character or reputation.[66] The unrebutted testimony of Mr. Eichelberger was offered to establish this factor;[67] (7) expression of remorse and cooperation[68] .Not only has Mr. Carucci convincingly stated his remorse on the record, he has apologized to his clients. In

---

58 ABA Standard 9.31.
59 ABA Standard 9.32(a).
60 Tr. 112.
61 ABA Standard 9.32(b).
62 ABA Standard 9.32(c).
63 ABA Standard 9.32(d).
64 ABA Standard 9.32(e).
65 Tr.137.
66 ABA Standard 9.32(g).
67 Tr. 49-59.
68 ABA Standard 9.32(m); Tr. 75.

addition, he has undertaken, on his own, to seek professional assistance through the Delaware Lawyers Assistance Program and by obtaining psychiatric help, filed for the Order of Disability on his own volition and sought help on cases from Mr. Billion.

The Board finds that the aggravating factors are significantly outweighed by the mitigating factors. Nevertheless, a public sanction is justified in order to satisfy the requirement of protecting the public.

## VII. PANEL'S RECOMMENDED SANCTION.

The Board's recommendation of an appropriate sanction assists the Court, but it is not binding.[69] The Court "has wide latitude in determining the form of discipline, and [it] will review the recommended sanction to ensure that it is appropriate, fair and consistent with . . . prior disciplinary decisions."[70] Accordingly, the Board must carefully examine prior disciplinary precedent to the extent possible in recommending sanctions.

The ODC cites to Respondent's multiple violations and recommends that Carucci be given a suspension of two years[71] but with retroactive effect to the date of his Disability Order[72.] To aid in our analysis we have reviewed the following decisions suggested by counsel or that we found on our own:

> 1) *In re Novak.*[73] Novak experienced marital troubles and struggled with bipolar disorder for over a decade. His situation was further destabilized by an adverse interaction between his bipolar medicine and a steroid prescribed for a rash. "Throughout 2008, Respondent's [Novak] practice declined and he lost most of his business and his

69 In re McCann, 894 A.2d at 1088; In re Bailey, 821 A.2d at 877.
70 Id.; In re Tonwe, 929 A.2d at 777. In re Steiner, 817 A.2d at 796.
71 Tr. 121, 154
72 Tr. 147.
73 5 A.3d 631 (Del. 2010)

staff."[74] Novak filed Annual Registration statements for 2008 and 2009 that were inaccurate. The Lawyers' Fund for Client Protection ordered an audit of Novak's records. That audit revealed substantial non-compliance in Novak's trust account with balances that had not been reconciled. A follow up audit showed little or no improvement, i.e., continued deficiencies in many areas. When his accounting staff asked for help with reconciling the books, Novak told them to take care of it.[75] He was found to have violated all five counts, specifically Rules (i) 1.15(a) (failing to safeguard client's funds), (ii) 1.15(d) (failure to maintain books and records. The panel found Novak acted with knowledge, indeed significant indifference, as to the condition of his books and records); (iii) 5.3 (failure to supervise those who maintained his books and records), (iv) 8.4(c) (making misrepresentations to the Court in his Certificates of Compliance) and (v) 8.4(d) (conduct prejudicial to the administrative of justice). While the panel found no proof of actual injury, the panel did find that Novak's total lack of financial control created "the potential for such injury".[76]

Aggravating factors found were: (i) pattern of misconduct; (ii) multiple offenses; and (iii) substantial experience in the practice of law. Mitigating factors found were: (i) absence of a dishonest motive, (ii) existence of personal or emotional problems, (iii) full and free disclosure and cooperation with disciplinary proceedings, and (iv)

74 Id. at *2.
75 Id. at 3-5.
76 Id. at *7-8

remorse. The panel recommended that Novak receive a suspension of no less than one year. The one glaring difference between _Novak_ and the present case is that the present case had eleven instances of the lawyer not doing his duty to his client by not performing the tasks for which he was retained.   No such issues were raised in _Novak_. Therefore, a one year suspension to Carucci does not seem sufficient.

2) _In re Bailey_.[77]   The issue was a managing partner's failure to supervise, resulting in books and records and tax obligations not complying with rules governing their maintenance.  The Respondent and the ODC stipulated to a public reprimand and a three year probation. The Board panel refused to accept the stipulated sanction, instead recommending a suspension of six months and one day. No claims of (i) failing to safeguard client funds or (ii) failing to represent clients properly were present in _Bailey_, where multiple counts have been found against Carucci.

3) _In the Matter of McDermott-Lundin_.[78]  The Board panel found the Respondent was in violation of not responding to clients or keeping them informed on the status of their respective cases.  The Board panel recommended a sanction of a one (1) year suspension, retroactive to the Court's Interim Suspension Order. The Court's order accepted the panel's factual findings, but without comment or explanation, imposed a suspension of two years, retroactive to the

---

77 821 A.2d 851 (Del. 2003).
78 956 A. 2d 642 (Del. 2001).

entry of the Interim Suspension Order. The Court's action suggests it believes a two year suspension is an appropriate sanction for inattention to client matters. If so, a two year suspension would be called for in the present case, at least before consideration of aggravating and mitigating factors.

4) *In the Matter of Carmine*.[79] Respondent was found to have committed violations of (i) neglecting clients' legal matters, (ii) failure to keep clients informed of the status of their cases; (iii) misrepresentations to clients on the status of their cases; (iv) failing to perfect an appeal; (v) failing to pursue negotiations or file suit; (vi) failure to prepare a stipulation for substitution of counsel; (vii) failure to surrender his file to new counsel; and (viii) failure to respond to lawful demand for information from ODC. The Court imposed a sanction of a two year suspension where respondent (i) was suffering from emotional problems, (ii) had sought to rehabilitate himself, (iii) had shown remorse for his misdeeds; (iv) and made restitution to one client to rectify financial damage caused by Respondent's misconduct. The Court stated, "We conclude that the serious nature of the transgressions established in these proceedings requires, *inter alia*, that Carmine be suspended from the Bar of the State of Delaware for a period of two years."[80] *Carmine* confirms that the serious nature of the transgressions by Carucci with eleven (11) different clients, failure to

---

79 559 A.2d 248 (Del. 1989)
80 Id. at *12.

safeguard client funds and misrepresentation to the Court warrant a significant suspension.

5) *In the Matter of Higgins*[81] The charges against Higgins related to six different client matters. The violations included (i) failure to file a name change petition and not informing the client that the petition had not been filed, (ii) failing to respond to Disciplinary Counsel, (iii) inaction in a matter on the Court of Chancery resulting in the matter being dismissed (a loss of a client's right to pursue his cause of action), (iv) failing to file an appeal in a Family Court order and then failing to cooperate with substituting counsel, (v) mishandling a matter such that default judgment was not vacated and a levy of sale was not quashed and failed to advise client of the result, and (vi) mishandling a conflict of interest in a real estate matter. The Court imposed a one year suspension. A shorter suspension from other cases was imposed due to the weight of mitigating circumstances. *Higgins* teaches that mitigating factors can justify reduction of a sanction below the presumed sanction.

The ODC argues that Carucci's actions or misconduct must be found to be knowing within the meaning of the ABA Standards[82]. Under those ABA Standards,

> "Knowledge" is the conscious awareness of the nature or attendant circumstances of the conduct but without the conscious objective or purpose to accomplish a particular result.

Respondent did have the requisite state of mind as defined in that section.

---

81 565 A. 2d 901 (Del. 1989).
82 Tr. 95.

Under ABA Standard 4.42, suspension is called for. Section 4.42 provides: Suspension is generally appropriate when:

(a) a lawyer knowingly fails to perform services for a client and causes injury or potential injury to a client, or

(b) a lawyer engages in a pattern of neglect and causes injury or potential injury to a client.

After careful study of the ABA Standards in conjunction with the facts presented, we believe "Knowledge" is the definition properly applied to Carucci's misconduct. The common thread running through the cases seems to be that the more numerous or serious the neglect of client matters, where coupled with failure to safeguard client funds, the more severe the sanction should be. Based on the cases we reviewed in conjunction with the eleven (11) violations of client neglect, the failure to safeguard client funds (even though some of those funds were refunded), and the misrepresentation to the Court, a two year suspension is the presumptive sanction before application of aggravating and mitigating circumstances.

As we have noted, we believe the mitigating factors significantly outweigh the aggravating factors, enough to warrant a reduction from the presumptive two year sanction. As such, and balancing the violations admitted and found by the Panel, along with the aggravating and mitigating circumstances existing in Mr. Carucci's situation, we believe an eighteen month suspension is the proper sanction to be imposed made retroactive to the date of the Disability Order. We realize that under the rules for reinstatement, since the sanction exceeds six months, Carucci will have to apply for readmission and carry a burden of demonstrating by clear and convincing evidence that he is fit for readmission. We think it is important to the disciplinary process as applied to

Respondent that he be required to make a showing that he is now able to maintain a busy law practice without detriment to his clients.[83]

Conclusion and Signature Pages Follow

---

[83] There was some discussion at the Hearing about conditions. We believe conditions to his readmission should be recommended by the panel who hears Respondent's application for readmission.

For the reasons stated herein, the Panel recommends a suspension of eighteen months to be served retroactive to the date of the Disability Order, October 13, 2013. Since the eighteen month period has passed, Respondent, as we understand the readmission procedure, can begin that process immediately upon entry of an order by the Court in connection with this Report.

_____
Wayne J. Carey

_____
John L. Reed

_____
Dennis L. Klima

January __, 2016

For the reasons stated herein, the Panel recommends a suspension of eighteen months to be served retroactive to the date of the Disability Order, October 13, 2013. Since the eighteen month period has passed, Respondent, as we understand the readmission procedure, can begin that process immediately upon entry of an order by the Court in connection with this Report.

_____

Wayne J. Carey

_____

John L. Reed

_____

Dennis E. Klima

January 26 2016

For the reasons stated herein, the Panel recommends a suspension of eighteen months to be served retroactive to the date of the Disability Order, October 13, 2013. Since the eighteen month period has passed, Respondent, as we understand the readmission procedure, can begin that process immediately upon entry of an order by the Court in connection with this Report.

_____
Wayne J. Carey

_____
John L. Reed

_____
Dennis L. Klima

January 16, 2016